**UNITED STATES ex rel. BRAZIER et al. v. COMMISSIONER OF IMMIGRATION AT PORT OF NEW YORK.**

(Circuit Court of Appeals, Second Circuit. December 15, 1924.)

No. 41.

1. Aliens ⬤54—May be deported following conviction for violation of Espionage and Selective Service Acts, regardless of length of residence.

Aliens convicted of offenses under Selective Service Act May 18, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), and Espionage Act June 15, 1917, may, if found undesirable, be deported at any time under Alien Act May 10, 1920 (Comp. St. Ann. Supp. 1923, §§ 4289¼b[4]–4289¼b[6]), regardless of period of residence in the United States.

2. Aliens ⬤53—Deportation exercise of fundamental right of sovereign.

Deportation is not a punishment, but is an exercise of fundamental right of a sovereign, a right which is exercised by the Legislature, and one cannot therefore be pardoned from deportation.

3. Aliens ⬤53 — Pardon ⬤1 — President's document held "commutation" and not "pardon," preventing deportation.

Document by which the President did "hereby commute the sentence" of person who had

been convicted under the Selective Service Act May 8, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), and Espionage Act June 15, 1917, "to the term already served, upon condition that he be law-abiding and loyal," etc., and which gave the President the right to revoke the "commutation" for non-compliance with conditions was not a pardon and did not preclude deportation under Alien Act May 10, 1920 (Comp. St. Ann. Supp. 1923, §§ 4289¼b[4]–4289¼b[6]), but merely a "commutation," which means a change of punishment, while a "pardon" avoids or terminates punishment for crime.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commute—Commutation; Pardon.]

**4. Aliens ☞53—President by commutation of sentence cannot preclude deportation of undesirable alien.**

The President cannot under Const. art. 2, § 2, by commutation of sentence on conditions for violation of which the commutation may be revoked, preclude deportation of alien under Alien Act May 10, 1920 (Comp. St. Ann. Supp. 1923, §§ 4289¼b[4]–4289¼b[6]), providing for deportation of alien who is a convict and is also undesirable.

Learned Hand, District Judge, dissenting.


Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus proceedings by the United States, on the relation of Richard Brazier, Peter Green, Joe Grabner, Don Sheridan, and James Slovik, against the Commissioner of Immigration at the Port of New York. Writ dismissed, and relators appeal. Reversed, with directions.

Relators are aliens. Brazier is English and has been in the United States since 1911; Green, Bohemian, here since 1894; Graber, Russian, here since 1910; Sheridan, Scotch, here since 1906; Slovik, Russian, here since 1911. ·

They were in 1918 severally convicted in the District Court for the Northern District of Illinois, inter alia for violating statutes commonly known as the "Selective Service Act" (of May 18, 1917 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k]), and the "Espionage Act" (of June 15, 1917 [40 Stat. 217]). In pursuance of sentence upon these convictions, they were all incarcerated in the United States Penitentiary at Leavenworth, Kan.

While they were thus undergoing imprisonment, Congress passed the Alien Act of May 10, 1920 (Comp. St. Ann. Supp. 1923, §§ 4289¼b[4]–4289¼b[6]).

Thereafter and in June, 1921, the Secretary of Labor issued warrants of arrest against these relators on the ground that they were severally aliens who, after August 1, 1914, had been convicted of offenses under the Selective Service Act and/or the Espionage Act, and were therefore, under the Alien Act of May 10, 1920, deportable.

Hearings were had at the Leavenworth Prison, and the record of such hearings having been considered, the Secretary issued warrants of deportation against all the relators in November, 1921.

These warrants remained unexecuted because relators were in jail for more than a year.

In June, 1923, the President issued to each of them what is called in the record a commutation.

This document, issued over the seal of the Department of Justice, after reciting the facts of conviction and imprisonment pursuant to sentence, continues:

"Now, therefore, be it known, that I, Warren G. Harding, President of the United States of America, in consideration of the premises, divers other good and sufficient reasons me thereunto moving, do hereby commute the sentence of the same Don Sheridan to the term already served upon condition that he be law-abiding and loyal to the government of the United States, and does not encourage, advocate or become willfully connected with lawlessness in any form, and upon the further condition that if he violates any of the foregoing conditions, of which fact the President shall be the sole judge, he, the President, may revoke the commutation, and it shall thereupon become null and void and of no effect, and he may, by direction to any officer of the penitentiary where the prisoner is now confined, or to any United States marshal or deputy marshal, cause the said Don Sheridan to be apprehended and returned to the penitentiary, there to complete the service of his sentence."

Thereupon the relators were severally discharged from the penitentiary, were arrested under the pending warrants of deportation, and while in New York and held under said warrants, took out this writ of habeas corpus. The lower court dismissed the writ, and relators appealed.

Hale, Nelles & Shorr, of New York City (Walter H. Pollak, Isaac Shorr, and Carol Weiss King, all of New York City, of counsel), for appellant.

William Hayward, U. S. Atty., of New York City (James C. Thomas, Asst. U. S. Atty., of New York City, of counsel), for appellee. ·

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). The decision in Mahler v. Eby, 264 U. S. 32, 44 S. Ct. 283, 68 L. Ed. 549, filed some months after entry of order appealed from, settles some points.

The Secretary of Labor, proceeding under the Act of May 10, 1920. (41 Stat. 593), did not in this instance, any more than he did in the Mahler Case, make a formal finding that relators were "undesirable residents of the United States"; therefore this matter must take the same course as was directed in the decision cited.

But it is argued that because the act of 1920 does "no more than add to the list of deportable offenses," and the "basic" act of 1917 limits the time for deportation to five years after entry, and deportation under the 1917 statute cannot be awarded for a first offense committed after such five years, and all these relators are so far as shown first offenders, and all had been in this country upwards of five years when they severally committed the offenses for which they were convicted, it follows that the 1920 act does not apply to them.

[1] This contention might be summarily answered by referring to the Mahler Case, which bluntly declares (page 48), "No time limitation is imposed upon proceedings under the" 1920 statute.

But further it is clear from consideration of the nature of and occasion for the Espionage and Selective Service Acts, and the language of the act of 1920, that persons, who had been or might thereafter be actually convicted of offending against measures adopted only to preserve the life of the nation in time of war, were in a class by themselves, and that class was to be treated in a way of its own, not like other aliens who had not manifested aggressive hatred of the land they chose to inhabit.

Men such as these relators had had no chance in time of peace to show how they would behave in time of war. They were typical of a class, which, if not discovered only under war conditions, rendered itself so markedly harmful to the national life in 1917–1919, that its members were singled out for removal from a community they evidently wished to injure or destroy. No reason could or can be shown why the Congress should restrict removal to those who offended before they had perhaps time to become ac-climated, and free those who by long residence had learned how to do the more harm. Length of years in residence only added to gravity of offense. Therefore it is reasonable to read the words of the 1920 act literally, and to hold, as we do, that aliens convicted under the statutes referred to may, if found undesirable, be deported at any time.

It is next urged that the document above quoted, and handed each relator in June, 1923, was a pardon, perhaps conditional, but still something which forbade any deportation while executive clemency permitted the men to go free of imprisonment, and they were living under a possibility of recall to jail. Such removal would be either a denial of the lawful effect of a pardon, or a violation of the President's constitutional right to extend clemency to offenders.

[2] There are two quite distinct parts to this proposition. If the paper was a pardon, duly accepted, the question is vital—of what were they pardoned? Plainly of certain offenses under the Espionage and Selective Service Acts. They were not, and could not be, pardoned from deportation. A pardon is for a crime (with exceptions here wholly unimportant); inter alia, it avoids or terminates punishment for that crime, but deportation is not a punishment, it is an exercise of one of the most fundamental rights of a sovereign (Mahler Case, supra, page 39), a right which under our form of government is exercised by legislative authority.

If it be assumed that this was a pardon, could it not only terminate punishment for crime, but prevent Congress from expelling an undesirable alien from this country? This assuredly would be a singular extension of presidential power, and an enlargement of the function of a pardon hitherto unthought of.

The reply made for respondent to this first branch of the above-stated proposition is that the executive document of 1923 did not pretend to be a pardon, was not a pardon, and was no more than what it called itself, a commutation during good behavior, or "with a string tied to it."

But this reply, if well made, brings one face to face with the second branch of relator's argument: For if the President intended to watch the men's conduct and again incarcerate them if they misbehaved in ways specified in his commutation, is it unlawful to send them out of the country, where his arm cannot (conveniently, at all events) reach them?

[3] We decline to hold that President Harding inadvertently pardoned these offenders, either conditionally or otherwise; for assuredly it was done inadvertently, if at all. It would require the plainest misuse of words of very rigid meaning, to hold that the statement "we do hereby commute" means we do hereby pardon.

It is not necessary to enlarge upon the historic theory or concept of a "pardon." It has an alliance with the conception of corruption of blood that lies very deep. It is enough now to observe that the effect of a pardon is "to relieve the offender of all unenforced penalties annexed to the conviction." Roberts v. State, 160 N. Y. 217, 54 N. E. 678. The documents under consideration did not profess to do this, and did not in fact do it. The men were practically turned loose on parole, and they were not relieved from the unexpired portion of their sentences.

We hold that the relators were given a "commutation." The word is a term of art and means, and long has meant, the change of one punishment for another and different punishment. A punishment by imprisonment for one year is a different punishment from the fulfillment of a two-year sentence, and this is true even though the change is made when the two-year sentence is half served. So the sentences of these men were changed by substituting for their whole term of imprisonment the performed portion thereof, plus existence under executive observance.

Thus the question raised by the above-outlined second branch of argument must be answered, and we inquire: (1) Can any intention be discerned, on the President's part, to interfere with the operation of a law in legal theory wholly unrelated to the offense, the punishment of which he commuted? And (2) if such intent is reasonably discernible, was it within the executive power so indefinitely to avoid the operation of an act of Congress?

We fail to discover in the act or language of the Executive any intent to avoid or even to consider the operation of the act of 1920.

The relators were told that if they became "willfully connected with lawlessness in any form," the President would send them back to jail. If they had all united in a burglary, they might and probably would have gone to a state penitentiary; but no one would have thought of sending them back to the United States prison until after they had paid the burglar's penalty. In other words, they were turned loose to take their chances

with other residents, and if they transgressed the terms of their commutations, the Executive would have to lay hands on them as best it could. And if some other law wholly unconnected with the President, and entirely outside of his pardoning power, removed them from his grasp, it would be no more than a life sentence in a state penitentiary would do.

But answering our second query, the pardoning power of the President embraces the power of commutation, as the whole contains all its parts. Yet the whole power has its constitutional limitations. It extends only to "offenses against the United States."

Under the act of 1920, an alien, to be deportable, must be, first, a convict, and, second, undesirable.

It would perhaps be arguable that a pardon, full and free, not only wiped out the punishment but expunged even from existence the crime; so that one who is pardoned is no convict, he is not even a criminal. Therefore one of the two requisites would be nonexistent.

But as no such extinguishing pardon was attempted, we feel assured that no commutation of sentence or liberation on parole can be held to prevent the operation of a general law.

[4] If these men had served their sentences in full, they would plainly, "if undesirable," be subject to deportation; and we hold that if the Executive by the device of shortening their sentences, subject to executive pleasure at all times, wished by this "cat and mouse" procedure to keep undesirable aliens in this country, it would be beyond Executive power; because such substantial regulation of the status of aliens bears no relation whatever to the constitutional pardoning power as described in article 2, § 2, United States Constitution. If the power, or the effect of the power, here contended for, is not found positively or by necessary implication in that constitutional grant, it does not exist.

The judgment of the lower court is reversed, with directions not to discharge the relators until the Secretary of Labor shall have had reasonable time in which to correct and perfect his findings on the evidence produced at the original hearing, if he finds it adequate, or to initiate other proceedings against them.

LEARNED HAND, District Judge (dissenting). I agree that the order must be reversed, but I go further than the majority and believe that the relators should be

unconditionally discharged. My reason is that I think the President's order of June 19, 1923, must be considered as a conditional pardon, which, while outstanding, prevents the aliens' deportation under the second proviso of section 19 of the Act of 1917. It is quite true that the order uses the word "commute" and that we must take this as deliberate. But the word "commute" is not conclusive, Lee, Sergeant, v. Murphy, 22 Grat. (Va.) 789, 12 Am. Rep. 563, and if we treat the order as a commutation it is not valid throughout. I think we should not so read it if we can help; ut res magis valeat. Its invalidity as a commutation arises because the President even under his power to commute may not change the lawful sentence of a court except by reducing it. None of these relators was sentenced to serve a term which was not continuous, and no one could impose a different sentence upon him. To let him out and put him back after an interval was to divide his sentence piecemeal which made it quite another punishment. Nor is this in the least a formal difference. To be released, to re-establish one's life in the world, and then to be retrapped, is a vastly different matter from enduring at a stretch the pains of full execution. While I know of no case on the point, it seems hardly necessary to labor the reasoning upon so plain a matter.

On the other hand, it is abundantly settled in the books that a pardon may be conditional, and that the condition may be subsequent. Ex parte Wells, 18 How. 307, 15 L. Ed. 421; Lee, Sergeant, v. Murphy, supra; Arthur v. Craig, 48 Iowa, 264, 30 Am. Rep. 395; Woodward v. Murdock, 124 Ind. 439, 24 N. E. 1047; Crooks v. Sanders, 123 S. C. 28, 115 S. E. 760, 28 A. L. R. 940; Alvarez v. State, 50 Fla. 24, 39 So. 481, 7 Ann. Cas. 88, 111 Am. St. Rep. 102; Ex parte Rice, 72 Tex. Cr. R. 587, 162 S. W. 891. Bishop recognizes the same law (1 Bish. New Cr. Law [9th Ed.] 658). The apparent antinomy arises because a pardon, like a deed, must be accepted to be valid at all, U. S. v. Wilson, 7 Pet. 150, 8 L. Ed. 640; Burdick v. U. S., 236 U. S. 79, 35 S. Ct. 267, 59 L. Ed. 476, though acceptance will be presumed if the convict do not re-

ject it. But his consent is necessary, for he may prefer to suffer execution than to perform the condition. In the case at bar, these relators, presumably confident of their ability to satisfy the President in their deportment, were willing to run the risk of re-arrest and of serving out what remained of their sentences. That willingness, and that only, makes possible the validity of the whole order of June 19, 1923.

So we are faced with the alternative of treating the order as in part void, or as a conditional pardon. We have no right, I submit, merely from the use of the word "commute," to say that the President would have released the relators at all, if he had supposed that the condition was invalid. We should look to the substance rather than the form; to what he meant to do, than to the language he chose. It is argued that their release was intended only for the purpose of deportation, but such a conclusion is palpably erroneous. The deportation order had actually passed before the release was given. I own I find it hard to see on what theory it can be supposed that in such a posture we are free to treat the condition as idle surplusage. All the President need do was to commute the sentences absolutely and the deportation warrants waited at the prison door. To override so clearly expressed a purpose on the strength of an inapposite word, or because we assume that the President must have regarded the crimes as too heinous to be paltered with, appears to me unjustified. Finally, we should, I think, remember that we are dealing in any view with an act of grace on which we are admonished to look with an auspicious eye and whose conditions we should not narrowly construe. Osborn v. U. S., 91 U. S. 474, 478, 23 L. Ed. 388.

These men may yet be subject to deportation, if, the condition falling in, they serve their sentence and are then released. For the condition would in that case have invalidated the pardon ab initio and they would be in the same case as though it had never been granted. But while it is outstanding they seem to me to have the status of pardoned convicts, and as such the second proviso of section 19 protects them.