SCHICK *v.* REED, CHAIRMAN, UNITED STATES
BOARD OF PAROLE, ET AL.

No. 73–5677.  Argued October 23, 1974—Decided December 23, 1974

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post,* p. 268.

*Homer E. Moyer, Jr.,* argued the cause for petitioner *pro hac vice.* With him on the briefs was *Robert N. Sayler.*

*Louis F. Claiborne* argued the cause for respondents. With him on the brief were *Solicitor General Bork, Assistant Attorney General Petersen,* and *Harry R. Sachse.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

In 1960, the President, acting under the authority of Art. II, § 2, cl. 1, of the Constitution, commuted petitioner Maurice L. Schick's sentence from death to life imprisonment, subject to the condition that he would not thereafter be eligible for parole. The petitioner challenges the validity of the condition, and we granted certiorari to determine the enforceability of that commutation as so conditioned.

The pertinent facts are undisputed. In 1954 petitioner, then a master sergeant in the United States Army stationed in Japan, was tried before a court-martial for the brutal murder of an eight-year-old girl. He admitted the killing, but contended that he was insane at the time that he committed it. Medical opinion differed on this point. Defense experts testified that petitioner could neither distinguish between right and wrong nor adhere to the right when he killed the girl; a board of psychiatrists testifying on behalf of the prosecution concluded that petitioner was suffering from a nonpsychotic behavior disorder and was mentally aware of and able to control his actions. The court-martial rejected petitioner's defense and he was sentenced to death on March 27, 1954, pursuant to Art. 118 of the Uniform Code of Military Justice, 10 U. S. C. § 918. The conviction and sentence were affirmed by an Army Board of Review and, following a remand for consideration of additional psychiatric reports, by the Court of Military Appeals. 7 U. S. C. M. A. 419, 22 C. M. R. 209 (1956).

The case was then forwarded to President Eisenhower for final review as required by Art. 71 (a) of the UCMJ,

10 U. S. C. § 871 (a).   The President acted on March 25, 1960:

> "[P]ursuant to the authority vested in me as President of the United States by Article II, Section 2, Clause 1, of the Constitution, the sentence to be put to death is hereby commuted to dishonorable discharge, forfeiture of all pay and allowances becoming due on and after the date of this action, and confinement at hard labor for the term of his [petitioner's] natural life.   This commutation of sentence is expressly made on the condition that the said Maurice L. Schick shall never have any rights, privileges, claims, or benefits arising under the parole and suspension or remission of sentence laws of the United States and the regulations promulgated thereunder governing Federal prisoners confined in any civilian or military penal institution (18 U. S. C. 4201 *et seq.*, 10 USC 3662 *et seq.*, 10 USC 871, 874), or any acts amendatory or supplementary thereof."   App. 35.

The action of the President substituted a life sentence for the death sentence imposed in 1954, subject to the conditions described in the commutation.   Petitioner was accordingly discharged from the Army and transferred to the Federal Penitentiary at Lewisburg, Pa.   He has now served 20 years of his sentence.   Had he originally received a sentence of life imprisonment he would have been eligible for parole consideration in March 1969; the condition in the President's order of commutation barred parole at any time.

In 1971, while appeals challenging the validity of the death penalty were pending in this Court, petitioner filed suit in the United States District Court for the District of Columbia to require the members of the United States Board of Parole to consider him for parole.   The District

Court granted the Board of Parole's motion for summary judgment and the Court of Appeals affirmed, unanimously upholding the President's power to commute a sentence upon condition that the prisoner not be paroled. In addition, it rejected by a 2-1 vote petitioner's argument that *Furman* v. *Georgia,* 408 U. S. 238, decided on June 29, 1972, requires that he be resentenced to a simple life term, the alternative punishment for murder under Art. 118. 157 U. S. App. D. C. 263, 483 F. 2d 1266. We affirm the judgment of the Court of Appeals.

## I

When the death sentence was imposed in 1954 it was, as petitioner concedes, valid under the Constitution of the United States and subject only to final action by the President. Absent the commutation of March 25, 1960, the sentence could, and in all probability would, have been carried out prior to 1972. Only the President's action in commuting the sentence under his Art. II powers, on the conditions stipulated, prevented execution of the sentence imposed by the court-martial.

The essence of petitioner's case is that, in light of this Court's holding in *Furman* v. *Georgia, supra,* which he could not anticipate, he made a "bad bargain" by accepting a no-parole condition in place of a death sentence. He does not cast his claim in those terms, of course. Rather, he argues that the conditions attached to the commutation put him in a worse position than he would have been in had he contested his death sentence—and remained alive—until the *Furman* case was decided 18 years after that sentence was originally imposed.

It is correct that pending death sentences not carried out prior to *Furman* were thereby set aside without conditions such as were attached to petitioner's commutation. However, petitioner's death sentence was not pending in 1972 because it had long since been commuted.

The question here is whether *Furman* must now be read as nullifying the condition attached to that commutation when it was granted in 1960. Alternatively, petitioner argues that even in 1960 President Eisenhower exceeded his powers under Art. II by imposing a condition not expressly authorized by the Uniform Code of Military Justice.

In sum, petitioner's claim gives rise to three questions: First, was the conditional commutation of his death sentence lawful in 1960; second, if so, did *Furman* retroactively void such conditions; and third, does that case apply to death sentences imposed by military courts where the asserted vagaries of juries are not present as in other criminal cases? Our disposition of the case will make it unnecessary to reach the third question.

## II

The express power of Art. II, § 2, cl. 1, from which the Presidential power to commute criminal sentences derives, is to "grant Reprieves and Pardons . . . except in Cases of Impeachment." Although the authors of this clause surely did not act thoughtlessly, neither did they devote extended debate to its meaning. This can be explained in large part by the fact that the draftsmen were well acquainted with the English Crown authority to alter and reduce punishments as it existed in 1787. The history of that power, which was centuries old, reveals a gradual contraction to avoid its abuse and misuse.[1] Changes were made as potential or actual abuses were perceived; for example, Parliament restricted the power to grant a pardon to one who transported a prisoner overseas to evade the Habeas Corpus Act, because to allow such pardons would drain the Great Writ of its vitality. There

---

[1] See generally 6 W. Holdsworth, History of English Law 203 (1938).

were other limits, but they were few in number and similarly specifically defined.[2]

At the time of the drafting and adoption of our Constitution it was considered elementary that the prerogative of the English Crown could be exercised upon conditions:

> "It seems agreed, That the king may extend his mercy on what terms he pleases, and consequently may annex to his pardon any condition that he thinks fit, whether precedent or subsequent, on the performance whereof the validity of the pardon will depend." 2 W. Hawkins, Pleas of the Crown 557 (6th ed. 1787).

Various types of conditions, both penal and nonpenal in nature, were employed.[3] For example, it was common for a pardon or commutation to be granted on condition that the felon be transported to another place, and indeed our own Colonies were the recipients of numerous subjects of "banishment." This practice was never questioned despite the fact that British subjects generally could not be forced to leave the realm without an Act of Parliament and banishment was rarely authorized as a punishment for crime. The idea later developed that the subject's consent to transportation was necessary, but in most cases he was simply "agreeing" that his life should be spared. Thus, the requirement of consent was a legal fiction at best; in reality, by granting pardons or commutations conditional upon banishment, the Crown was exercising a power that was the equivalent and completely

---

[2] See 3 E. Coke, Institutes 233 (6th ed. 1680); 5 J. Comyns, Digest of the Laws of England 230 (5th ed. 1822); J. Chitty, Prerogatives of the Crown 90–91 (1820); 4 W. Blackstone, Commentaries *398.

[3] Typical conditions were that the felon be confined at hard labor for a stated period of time, 4 Blackstone, supra, n. 2, at *401, or that he serve in the Armed Forces. 2 D. Hume, Crimes 481 (2d ed. 1819).

independent of legislative authorization.[4]   11 W. Holds-
worth, History of English Law 569–575 (1938).   In
short, by 1787 the English prerogative to pardon was
unfettered except for a few specifically enumerated
limitations.

The history of our executive pardoning power reveals
a consistent pattern of adherence to the English common-
law practice.   The records of the Constitutional Con-
vention, as noted earlier, reveal little discussion or debate
on § 2, cl. 1, of Art. II.   The first report of the Committee
on Detail proposed that the pertinent clause read: "He
[the President] shall have power to grant reprieves
and pardons; but his pardon shall not be pleadable in
bar of an impeachment." [5]   This limitation as to im-
peachments tracked a similar restriction upon the Eng-
lish royal prerogative which existed in 1787.   4 W.
Blackstone, Commentaries *399–400.   An effort was made
in the Convention to amend what finally emerged as § 2,
cl. 1, and is reflected in James Madison's Journal for
August 25, 1787, where the following note appears:

> "Mr. Sherman moved to amend the 'power to
> grant reprieves and pardons' so as to read 'to grant
> reprieves until the next session of the Senate, and
> pardons with consent of the Senate.' "   2 M. Farrand,
> Records of the Federal Convention of 1787, p. 419
> (1911).

---

[4] In *Ex parte Wells*, 18 How. 307 (1856), this Court
expressed the view that legislative authorization was essential to the
use of banishment from the realm as a commutable punishment by
the English Crown.   *Id.*, at 313.   However, that conclusion was no
more than dictum and is historically incorrect.   Indeed, about
the time that *Wells* was decided Parliament abolished banish-
ment as a penalty in England, but the Crown retained and continued
to exercise the power to annex such conditions to pardons.   11 Holds-
worth, *supra*, n. 1, at 575.

[5] 2 M. Farrand, Records of the Federal Convention of 1787, p.
185 (1911).

The proposed amendment was rejected by a vote of 8–1. *Ibid.* This action confirms that, as in England in 1787, the pardoning power was intended to be generally free from legislative control.

Later Edmund Randolph proposed to add the words " 'except cases of treason.' " Madison's description of Randolph's argument reflects familiarity with the English form and practice: "The *prerogative* of pardon in these [treason] cases was too great a trust." *Id.,* at 626 (emphasis added). Randolph's proposal was rejected by a vote of 8–2, and the clause was adopted in its present form. Thereafter, Hamilton's Federalist No. 69 summarized the proposed § 2 powers, including the power to pardon, as "resembl[ing] equally that of the King of Great-Britain and the Governor of New-York." The Federalist No. 69, p. 464 (J. Cooke ed. 1961).[6]

We see, therefore, that the draftsmen of Art. II, § 2, spoke in terms of a "prerogative" of the President, which ought not be "fettered or embarrassed." In light of the English common law from which such language was

---

[6] In the Federalist No. 74 Hamilton enlarged on this point:

"Humanity and good policy conspire to dictate; that the benign prerogative of pardoning should be as little as possible fettered or embarrassed. The criminal code of every country partakes so much of necessary severity, that without an easy access to exceptions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel. As the sense of responsibility is always strongest in proportion as it is undivided, it may be inferred that a single man would be most ready to attend to the force of those motives, which might plead for a mitigation of the rigor of the law, and least apt to yield to considerations, which were calculated to shelter a fit object of its vengeance. The reflection, that the fate of a fellow creature depended on his *sole fiat,* would naturally inspire scrupulousness and caution: The dread of being accused of weakness or connivance would beget equal circumspection, though of a different kind." The Federalist No. 74, pp. 500–501 (J. Cooke ed. 1961).

drawn, the conclusion is inescapable that the pardoning power was intended to include the power to commute sentences on conditions which do not in themselves offend the Constitution, but which are not specifically provided for by statute.

The few cases decided in this area are consistent with the view of the power described above. In *United States* v. *Wilson,* 7 Pet. 150 (1833), this Court was confronted with the question of whether a pardon must be pleaded in order to be effective. Mr. Chief Justice Marshall held for the Court that it must, because that was the English common-law practice:

> "As this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it." *Id.,* at 160.

Similarly, in *Ex parte Wells,* 18 How. 307 (1856), the petitioner had been convicted of murder and sentenced to be hanged. President Fillmore granted a pardon " 'upon condition that he be imprisoned during his natural life; that is, the sentence of death is hereby commuted to imprisonment for life in the penitentiary of Washington.' " *Id.,* at 308. Later, Wells sought release by habeas corpus, contending that the condition annexed to the pardon and accepted by him was illegal. His argument was remarkably similar to that made by petitioner here:

> "[A] President granting such a pardon assumes a power not conferred by the constitution—that he legislates a new punishment into existence, and sen-

tences the convict to suffer it; in this way violating the legislative and judicial powers of the government, it being the province of the first, to enact laws for the punishment of offences . . . , and that of the judiciary, to sentence . . . according to them." *Id.*, at 309.

However, the Court was not persuaded. After an extensive review of the English common law and that of the States, which need not be repeated here, it concluded:

> "The real language of [Art. II, § 2, cl. 1] is general, that is, common to the class of pardons, or extending the power to pardon to all kinds of pardons known in the law as such, whatever may be their denomination. We have shown that a conditional pardon is one of them. . . .
>
> "In this view of the constitution, by giving to its words their proper meaning, the power to pardon conditionally is not one of inference at all, but one conferred in terms.

> .  .  .  .  .

> ". . . [T]he power to offer a condition, without ability to enforce its acceptance, when accepted by the convict, is the substitution, by himself, of a lesser punishment than the law has imposed upon him, and he cannot complain if the law executes the choice he has made.
>
> " '. . . And a man condemned to be hung cannot be permitted to escape the punishment altogether, by pleading that he had accepted his life by *duress per minas.*' " *Id.*, at 314–315.

In other words, this Court has long read the Constitution as authorizing the President to deal with individual cases by granting conditional pardons. The very essence of the pardoning power is to treat each case individually.

The teachings of *Wilson* and *Wells* have been followed consistently by this Court. See, *e. g., Ex parte Grossman,* 267 U. S. 87 (1925) (upholding a Presidential pardon of a contempt of court against an argument that it violated the principle of separation of powers); *Ex parte Garland,* 4 Wall. 333 (1867). Additionally, we note that Presidents throughout our history as a Nation have exercised the power to pardon or commute sentences upon conditions that are not specifically authorized by statute. Such conditions have generally gone unchallenged and, as in the *Wells* case, attacks have been firmly rejected by the courts. See 41 Op. Atty. Gen. 251 (1955). These facts are not insignificant for our interpretation of Art. II, § 2, cl. 1, because, as observed by Mr. Justice Holmes: "If a thing has been practised for two hundred years by common consent, it will need a strong case" to overturn it. *Jackman* v. *Rosenbaum Co.,* 260 U. S. 22, 31 (1922).

## III

A fair reading of the history of the English pardoning power, from which our Art. II, § 2, cl. 1, derives, of the language of that clause itself, and of the unbroken practice since 1790 compels the conclusion that the power flows from the Constitution alone, not from any legislative enactments, and that it cannot be modified, abridged, or diminished by the Congress. Additionally, considerations of public policy and humanitarian impulses support an interpretation of that power so as to permit the attachment of any condition which does not otherwise offend the Constitution. The plain purpose of the broad power conferred by § 2, cl. 1, was to allow plenary authority in the President to "forgive" the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions which are in themselves constitutionally unobjectionable. If we were

to accept petitioner's contentions, a commutation of his death sentence to 25 or 30 years would be subject to the same challenge as is now made, *i. e.*, that parole must be available to petitioner because it is to others. That such an interpretation of § 2, cl. 1, would in all probability tend to inhibit the exercise of the pardoning power and reduce the frequency of commutations is hardly open to doubt. We therefore hold that the pardoning power is an enumerated power of the Constitution and that its limitations, if any, must be found in the Constitution itself. It would be a curious logic to allow a convicted person who petitions for mercy to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily assumed in accepting the commutation which he sought.

Petitioner's claim must therefore fail. The no-parole condition attached to the commutation of his death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or statutes otherwise precluding parole; [7] it does not offend the Constitution. Similarly, the President's action derived solely from his Art. II powers; it did not depend upon Art. 118 of the UCMJ or any other statute fixing a death penalty for murder. It is not correct to say that the condition upon petitioner's commutation was "made possible only through the court-martial's imposition of the death sentence." *Post*, at 269–270. Of course, the President may not aggravate punishment; the sentence imposed by statute is therefore relevant to a limited extent. But, as shown, the President has constitutional power to attach conditions to his commutation of any sentence. Thus, even if *Furman* v. *Georgia* applies to the military, a matter which we need not and do not decide, it could

---

[7] See, *e. g.*, 21 U. S. C. § 848 (c); Mass. Gen. Laws Ann., c. 265, § 2 (1970); Nev. Rev. Stat., Tit. 16, c. 200.030, § 6, c. 200.363, § 1 (a) (1973).

not affect a conditional commutation which was granted 12 years earlier.

We are not moved by petitioner's argument that it is somehow "unfair" that he be treated differently from persons whose death sentences were pending at the time that *Furman* was decided. Individual acts of clemency inherently call for discriminating choices because no two cases are the same. Indeed, as noted earlier, petitioner's life was undoubtedly spared by President Eisenhower's commutation order of March 25, 1960. Nor is petitioner without further remedies since he may, of course, apply to the present President or future Presidents for a complete pardon, commutation to time served, or relief from the no-parole condition. We hold only that the conditional commutation of his death sentence was lawful when made and that intervening events have not altered its validity.

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

The Court today denies petitioner relief from the no-parole condition of his commuted death sentence, paying only lip service to our intervening decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972). Because I believe the retrospective application of *Furman* requires us to vacate petitioner's sentence and substitute the only lawful alternative—life with the opportunity for parole, I respectfully dissent.

I

The Court misconstrues petitioner's retroactivity argument. Schick does not dispute the constitutional validity of the death penalty in 1954 under then-existing case law. Nor does he contend that he was under sentence of death [1]

---

[1] But see Part II, *infra*.

in 1972 when the decision issued in *Furman*; invalidating "the imposition and carrying out" of discretionary death sentences. *Id.*, at 239. Rather, he argues that the retroactive application of *Furman* to his no-parole commutation is required because the imposition of the death sentence was the indispensable vehicle through which he became subject to his present sentence. In other words, the no-parole condition could not now exist had the court-martial before which Schick was tried not imposed the death penalty.

The relationship between the death sentence and the condition is clear. Article 118 of the Uniform Code of Military Justice (UCMJ) [2] authorizes only two sentences for the crime of premeditated murder: death or life imprisonment which entails at least the possibility of parole. Confinement without possibility of parole is unknown to military law; [3] it is not and has never been authorized for any UCMJ offense, 10 U. S. C. §§ 877–934; Manual for Courts-Martial, 34 Fed. Reg. 10502 (1969). In short, the penal restriction of the commutation was a creature of Presidential clemency made possible only

---

[2] Article 118, 10 U. S. C. § 918, reads:

"Any person subject to this code who, without justification or excuse, unlawfully kills a human being, when he—

"(1) has a premeditated design to kill;

.                .                .                .                .

"shall suffer death or imprisonment for life as a court-martial may direct." May 5, 1950, c. 169, § 1, 64 Stat. 140.

[3] Military prisoners incarcerated in federal penitentiaries are governed by the same parole statutes and regulations applicable to all federal prisoners. Under the federal parole eligibility statute, 18 U. S. C. §§ 4202–4203 (1970 ed. and Supp. II), petitioner, an inmate for 20 years at Lewisburg, now has satisfied the 15-year prerequisite for parole consideration. See 10 U. S. C. § 858. Likewise, if Schick had been confined in a military facility he would now be eligible for parole under 10 U. S. C. §§ 952–953.

through the court-martial's imposition of the death sentence.

The retroactivity of *Furman* is equally unclouded. The Court "[has] not hesitated" to give full retroactive effect to the *Furman* decision. *Robinson* v. *Neil*, 409 U. S. 505, 508 (1973). See *Stewart* v. *Massachusetts*, 408 U. S. 845 (1972); *Marks* v. *Louisiana*, 408 U. S. 933 (1972); *Walker* v. *Georgia*, 408 U. S. 936 (1972). The *per curiam* decision struck down both "the imposition and the carrying out" of discretionary death sentences as cruel and unusual punishment in violation of the Eighth Amendment. 408 U. S., at 239. The opinion specifically held that the "judgment . . . is . . . reversed insofar as it leaves undisturbed the death sentence imposed . . . ." *Id.*, at 240. The retroactive application of *Furman* results in more than the simple enjoining of execution; it nullifies the very act of sentencing. In effect a post-*Furman* court must ensure a prisoner the same treatment that he would have been afforded had the death penalty not been imposed initially.[4]

The full retroactivity of a constitutional ruling is aimed at the eradication of all adverse consequences of prior violations of that rule. We have recognized the importance of erasing "root and branch" the adverse legal consequences, both direct and indirect, of prior constitutional violations. See, *e. g., McConnell* v. *Rhay*, 393 U. S. 2, 3 (1968); *Linkletter* v. *Walker*, 381 U. S. 618, 639 (1965). The effective operation of this procedure was demon-

---

[4] Where only one alternative punishment is available to the trial court, that punishment has been automatically imposed either by the appellate court itself, *e. g., State* v. *Johnson*, 31 Ohio St. 2d 106, 285 N. E. 2d 751 (1972); *Commonwealth* v. *Bradley*, 449 Pa. 19, 295 A. 2d 842 (1972); *Anderson* v. *State*, 267 So. 2d 8, 10 (Fla. 1972); or by the trial judge on direction from the appellate court, *e. g., Capler* v. *State*, 268 So. 2d 338 (Miss. 1972); *State* v. *Square*, 263 La. 291, 268 So. 2d 229 (1972); *Garcia* v. *State*, 501 P. 2d 1128 (Okla. Crim. 1972).

strated in the decisions on the right to counsel in state felony trials. See *Pickelsimer* v. *Wainwright,* 375 U. S. 2 (1963); *Kitchens* v. *Smith,* 401 U. S. 847 (1971); *Burgett* v. *Texas,* 389 U. S. 109 (1967); *United States* v. *Tucker,* 404 U. S. 443 (1972).

Since *Furman* is fully retroactive petitioner's case should be simple to resolve. The terms of Art. 118 of the UCMJ provide that a person convicted of premeditated murder "shall suffer death or imprisonment for life as a court-martial may direct." A death sentence was imposed by the court-martial and affirmed by the Board of Review and the United States Court of Military Appeals, 7 U. S. C. M. A. 419, 22 C. M. R. 209 (1956). The death sentence so imposed was declared unconstitutional by *Furman* and is therefore null and void as a matter of law. The only legal alternative—simple life imprisonment— must be substituted. Concomitantly, the adverse consequence of the death sentence—the no-parole condition of petitioner's 1960 commutation—must also be voided, as it exceeds the lawful alternative punishment that should have been imposed. Petitioner should now be subject to treatment as a person sentenced to life imprisonment on the date of his original sentence and eligible for parole.[5]

---

[5] Nothing in *Furman* suggests that it is inapplicable to the military. The *per curiam* carves out no exceptions to the prohibition against discretionary death sentences. The opinions of the five-member majority recognize no basis for excluding the members of the Armed Forces from protection against this form of punishment. Even the list of four capital punishment statutes not affected by the Court's decision, provided by my Brother STEWART, does not include the federal military statutes. 408 U. S. 238, 307 (1972). Even more persuasive is the language of my Brother POWELL in dissent which states that "numerous provisions of . . . the Uniform Code of Military Justice are also voided." *Id.,* at 417–418.

Beyond the language of *Furman* the Court has made clear in *Trop* v. *Dulles,* 356 U. S. 86 (1958), that the Eighth Amendment is appli-

272

The Court today suggests that petitioner cannot claim any benefit from *Furman* because no death penalty was pending against him at the time of the decision. The 1960 commutation is touted as the panacea for the constitutional defects of petitioner's original sentence. Unfortunately, such is not the case.

The imposition of the death sentence was the indispensable vehicle through which petitioner became subject to his present sentence. The commutation of the sentence did not cure the constitutional disabilities of the punishment. A noted expert on the subject of Presidential clemency states:

> "Unlike a pardon, a commutation does not absolve the beneficiary from most of the legal consequences of an offense." [6]

Although petitioner is not under direct threat of the death sentence, "he has suffered and continues to suffer enhanced punishment—the loss of his statutory right to

cable to the military. While the Court divided on the penal nature of the statute which provided additional sanctions for servicemen convicted of wartime desertion, there was no disagreement on the application of the Amendment.

I would also note that the UCMJ, enacted in 1950, has by decision and practice incorporated the Bill of Rights and afforded its protection to the members of the Armed Forces. See, *e. g., United States* v. *Tempia,* 16 U. S. C. M. A. 629, 634, 37 C. M. R. 249, 254 (1967); *United States* v. *Jacoby,* 11 U. S. C. M. A. 428, 430–431, 29 C. M. R. 244, 246–247 (1960); *United States* v. *Jobe,* 10 U. S. C. M. A. 276, 279, 27 C. M. R. 350, 353 (1959).

The fact that a court-martial rather than a jury imposes the death sentence is irrelevant. In my view the penalty is equally severe, and in my view equally offensive to the Eighth Amendment for that reason, see *Furman* v. *Georgia,* 408 U. S., at 314–374 (MARSHALL, J., concurring). Moreover, the potential for abuse and discrimination with which my Brethren were concerned in *Furman* is as evident here as in the civilian courts.

[6] W. Humbert, The Pardoning Power of the President 27 (1941).

be considered for parole—as a result of an illegally imposed death sentence " [7]   The full retrospective application of *Furman* requires the eradication of this vestige of the prior constitutional violation.   If petitioner had been granted stays of execution until *Furman* was decided, there is no doubt that his sentence would have to be vacated and a life sentence imposed instead.   The situation should be no different simply because the Chief Executive commuted his sentence—in effect granting a permanent stay of execution.   Nullification of the no-parole provision would relieve petitioner of this unconstitutional burden and clear the way for lawful resentencing with eligibility for parole.

## II

Since the majority devotes its opinion to a discussion of the scope of Presidential power, I am compelled to comment.   I have no quarrel with the proposition that the source of the President's commutation power is found in Art. II, § 2, cl. 1, of the Constitution, which authorizes the President to grant reprieves and pardons for offenses against the United States except for cases of impeachment.   *Biddle* v. *Perovich,* 274 U. S. 480 (1927).   Commutation is defined as the substitution of a lesser type of punishment for the punishment actually imposed at trial.[8]

---

[7] 157 U. S. App. D. C. 263, 270, 483 F. 2d 1266, 1273 (1973) (Wright, J., dissenting).

[8] Although pardon and commutation emanate from the same source, they represent clearly distinct forms of clemency.   Whereas commutation is a substitution of a milder form of punishment, pardon is an act of public conscience that relieves the recipient of all the legal consequences of the conviction.   See, *e. g., United States ex rel. Brazier* v. *Commissioner of Immigration,* 5 F. 2d 162 (CA2 1924); *Chapman* v. *Scott,* 10 F. 2d 156, 159 (Conn. 1925), aff'd, 10 F. 2d 690 (CA2), cert. denied, 270 U. S. 657 (1926); Note, Executive Clemency in Capital Cases, 39 N. Y. U. L. Rev. 136, 138 (1964);

274

The issue here is whether the President's expansion of an unencumbered life term by addition of a condition proscribing Schick's eligibility for parole went beyond the authority conferred by Art. II. Article 118 of the UCMJ and the implementing court-martial regulations prescribe mandatory adjudication of either death or life imprisonment for the crime of premeditated murder. 10 U. S. C. § 918; 34 Fed. Reg. 10704. I take issue with the Court's conclusion that annexation of the "no-parole condition . . . does not offend the Constitution." *Ante,* at 267. In my view the President's action exceeded the limits of the Art. II pardon power. In commuting a sentence under Art. II the Chief Executive is not imbued with the constitutional power to create unauthorized punishments.

The congressionally prescribed limits of punishment mark the boundaries within which the Executive must exercise his authority.[9] By virtue of the pardon power the Executive may abstain from enforcing a judgment by judicial authorities; he may not, under the aegis of that power, engage in lawmaking or adjudication. Cf. *United States* v. *Benz,* 282 U. S. 304, 311 (1931) (an act of clemency is an exercise of executive power which abridges the enforcement of the judgment, but does not alter it *qua* judgment); *United States ex rel. Brazier* v. *Commissioner of Immigration,* 5 F. 2d 162 (CA2 1924) (pardon power does not embrace right to bar congressionally prescribed deportation of prisoners).

While the clemency function of the Executive in the

---

Humbert, *supra,* n. 6, at 27; Black's Law Dictionary 351, 1268–1269 (4th ed. 1968).

[9] Indeed, Mr. Chief Justice Marshall expanded on the notion of separation of powers, stating: "[T]he power of punishment is vested in the legislative . . . department. It is the legislature . . . which is to define a crime, and ordain its punishment." *United States* v. *Wiltberger,* 5 Wheat. 76, 95 (1820).

federal criminal justice system [10] is consistent with the separation of powers, the attachment of punitive conditions to grants of clemency is not. Prescribing punishment is a prerogative reserved for the lawmaking branch of government, the legislature. As a consequence, President Eisenhower's addition to Schick's commutation of a condition that did not coincide with punishment prescribed by the legislature for *any* military crime,[11] much less this specific offense, was a usurpation of a legislative function. While the exercise of the pardon power was proper, the imposition of this penal condition was not embraced by that power.[12]

---

[10] Article 71 (a) of the UCMJ, 10 U. S. C. § 871 (a), outlines the Presidential role in the review of military convictions.

With the exception of premeditated murder and felony·murder the UCMJ authorizes punishment at the discretion of the court-martial. Thus, in the majority of cases the President would not be limited to only two alternatives but could commute to any lesser sentence than that imposed by the court-martial consistent with the statutory authorization. It is only in the face of the mandate of Art. 118, limiting the alternatives to death or life imprisonment with the possibility of parole, that the restriction to the statutory alternatives may appear at first blush unduly Draconian.

[11] As already indicated, confinement without opportunity for parole is unknown to military law. See text accompanying n. 3, *supra.* Moreover, the only federal-law recognition of this punishment in a civilian context is found in the very limited no-parole provisions dealing with continuing narcotics enterprises. 21 U. S. C. § 848. Guided by the special nature of drug offenses and drug offenders the Congress enacted this narrow exception to universal eligibility for parole. See H. R. Rep. No. 2388, 84th Cong., 2d Sess., 4, 8, 11, 64 (1956).

[12] The Court cites *Ex parte Wells,* 18 How. 307 (1856), and an opinion of Attorney General Brownell, 41 Op. Atty. Gen. 251 (1955), in support of the statement that "Presidents . . . have [frequently] exercised the power to pardon or commute sentences upon conditions that are not specifically authorized by statute." *Ante,* at 266. *Wells* involved the simple substitution of the lesser penalty of life imprisonment for death; no separate punitive condition was attached

The Court today advances the antecedent English pardon power and prior holdings of this Court in support of the legality of the no-parole condition. Neither body of law has established an Executive right to define extra-legislative punishments.[13] Nor does the historical status of the pardon power in England or analysis of prior non-penal conditions supply any relevance here.

A

The English annals offer dubious support to the Court. The majority opinion recounts in copious detail the historical evolution of the pardon power in England. *Ante,* at 260–262. See also *Ex parte Wells,* 18 How. 307, 309–313 (1856). The references to English statutes and cases are no more than dictum; as the Court itself admonishes, "the [pardon] power flows from the Constitution alone." *Ante,* at 266. Accordingly, the primary resource for analyzing the scope of Art. II is our own republican system of government. See *Grosjean* v. *American Press Co.,* 297 U. S. 233, 248–249 (1936). The separation of powers doctrine does not vest the Chief Executive with an unrestrained clemency power, *supra,* at 274–275, but views his functions as distinct from the other coordinate branches. *Ante,* at 262–264. The references to the early American experience are not dispositive.[14]

---

to the Executive action. A legal opinion from the Attorney General supplies reasoned interpretations but hardly bears the force of law.

[13] The King's pardon power, from which the President's Art. II power derives, also was subject historically to statutory limitations. See *Ex parte Wells, supra,* at 312–313; *id.,* at 322 (McLean, J., dissenting).

[14] With few exceptions conditional pardons were not granted by state governors except where authorized by law, *Ex parte Wells, supra,* at 322 (McLean, J., dissenting). The Court's references to the Framers' writings on the pardon power fail to take account of the separation of powers doctrine so fervently embraced by the constitutional drafters. *National Mutual Ins. Co.* v. *Tidewater Transfer*

Indeed, history recounts that even the pardon power of the King to "annex [a condition] to his bounty" was subject to statutory limitation. 4 W. Blackstone, Commentaries *401. As noted in the *Wells* case:

> "The sovereign of England, with all the prerogatives of the crown, in granting a conditional pardon, cannot substitute a punishment which the law does not authorize." 18 How., at 323 (McLean, J., dissenting).

Even the authority quoted by Blackstone in support of the proposition, 2 W. Hawkins, Pleas of the Crown 547 (8th ed. 1824), does not actually support the suggestion of unlimited power in the King. In fact, the conditions discussed were either imposed pursuant to statute or of a nonpunitive nature. See *Coles Case*, Moore K. B. 466, 72 Eng. Rep. 700 (1597); E. Coke, A Commentary upon Littleton 274b (19th ed. 1832). The Court acknowledges instances in which statutory authority placed restrictions on the monarch's power. *Ante*, at 260. The critical role of statutes in the imposition of the condition of banishment on pardons of convicted felons was recognized in a letter addressed to a member of the House of Lords:

> "There is hardly anything to be found respecting conditional pardons in the old English law-books; but the authority of the Crown to grant a conditional pardon in capital cases is . . . recognized in statute 5 Geo. 4, c. 84, s. 2 . . . ." W. Forsyth, Cases and Opinions on Constitutional Law 460 (1869).

---

*Co.*, 337 U. S. 582 (1949); The Federalist No. 47 (J. Madison) (J. Cooke ed. 1961); E. Corwin, The President: Office and Powers 140 (1940). In fact Corwin notes:

"[T]he President is not authorized to *add* to sentences imposed by the courts [pursuant to legislative direction]—he may only *mitigate* them . . . ." *Ibid.* (emphasis in original).

The King's prerogative was thus not as broad as the majority's reading of Blackstone indicates. The great discretion available to the King to dispense mercy did not incorporate into the pardoning power the royal right to invade the legislative province of assessing punishments.

**B**

Contrary to the Court's suggestion, limitation of Executive action to the statutory framework is not undermined by earlier decisions of this Court. In *Biddle* v. *Perovich*, 274 U. S. 480, 483 (1927), the Solicitor General expressly noted that "[a] commutation is the substitution of a milder punishment known to the law for the one inflicted by the court." Mr. Justice Holmes, writing for a unanimous Court, concluded on a related matter that consent to commutation was unnecessary since "[b]y common understanding imprisonment for life is a less penalty than death." *Id.*, at 487. The Court held that the "only question is whether the substituted punishment was authorized by law...." *Ibid.* While Holmes' specific reference is to the law of the Constitution, he then proceeds with a discussion of the statutory sanctions. Commutation to life imprisonment without any opportunity for parole would penalize the prisoner here beyond the terms of the UCMJ sanctions.

The requirement that the substituted sentence be one provided by law is not hampered by *Ex parte Wells*, *supra*, in which this Court upheld conditional commutation from a death sentence to a simple life term. The validity of mitigation of a sentence without depriving the prisoner of any additional rights is not inconsistent with rejection of unauthorized penal conditions. In *Wells* the Court acknowledged that limitations on the pardon power mandated its exercise "according to law; that is, as it had been used in England, and these States." 18 How., at 310. Although the *Wells* Court was not faced with the ques-

tion whether *all* possible conditions were in the ambit of Art. II, it addressed the specific limitation on penal conditions attached to commutations:

> "So, conditional pardons by the king do not permit transportation or exile as a commutable punishment, unless the same has been provided for by legislation." *Id.*, at 313.

The remaining cases on which the Court relies to sustain the condition offer minimal support and are easily distinguished.[15]

In conclusion I note that where a President chooses to exercise his clemency power he should be mindful that

> "[t]he punishment appropriate for the diverse federal offenses is a matter for the discretion of Congress, subject only to constitutional limitations, more particularly the Eighth Amendment." *Bell* v. *United States,* 349 U. S. 81, 82 (1955).

See *Ex parte United States,* 242 U. S. 27, 42 (1916). The Congress has not delegated such authority to the President. I do not challenge the right of the President to issue pardons on nonpenal conditions, but, where the Executive elects to exercise the Presidential power for commutation the clear import of the Constitution mandates that the lesser punishment imposed be sanctioned by the legislature.[16]

---

[15] *United States* v. *Wilson,* 7 Pet. 150 (1833), turned on the technical question of whether a pardon must be pleaded and only referred in dictum to the possibility that the President could condition a pardon. In *Ex parte Garland,* 4 Wall. 333 (1867), and *Ex parte Grossman,* 267 U. S. 87 (1925), the Court focused on the discretionary aspect of the pardon power which is here unchallenged. The emphasis was on the right of the President to grant a pardon to any criminal, for any offense, at any time. The question of conditional action was raised in only a tangential manner.

[16] The Court likens the no-parole condition to "sanctions imposed by legislatures such as mandatory minimum sentences . . . ." The

In sum, the no-parole condition is constitutionally defective in the face of the retrospective application of *Furman* and the extra-legal nature of the Executive action. I would nullify the condition, and direct the lower court to remand the case for resentencing to the only alternative available—life with the opportunity for parole—and its attendant benefits.

---

similarity is all too close, in my view. Indeed, it is precisely because the President has invaded the legislative domain that the condition must fail.