No. 28          June 20, 2013          715

## IN THE SUPREME COURT OF THE STATE OF OREGON

GARY D. HAUGEN,
*Plaintiff-Respondent*,

*v.*

John KITZHABER,
Governor of the State of Oregon,
*Defendant-Appellant*.

(CC 12C16560; CA A152412; SC S060761)

En Banc

On certification from the Court of Appeals under ORS 19.405.*

Argued and submitted March 14, 2013.

Harrison Latto, Portland, argued the cause and filed the brief for plaintiff-respondent.

Anna M. Joyce, Solicitor General, Salem, argued the cause and filed the brief for defendant-appellant. With her on the brief were Ellen F. Rosenblum, Attorney General, and Jake J. Hogue, Assistant Attorney General.

Bruce L. Campbell, Miller Nash LLP, filed a brief for *amici curiae* ACLU of Oregon, Inc., Oregon Justice Resource Center, and Oregon Capital Resource Center. With him on the brief were Elisa J. Dozono, Alexander M. Naito, Kevin Diaz, Jeffrey Ellis, and Erin McKee.

BALMER, C. J.

The judgment of the circuit court is reversed, and the case is remanded to the circuit court with instructions to enter judgment in accordance with this opinion.

_____
   * Appeal from Marion County Circuit Court, Timothy Alexander, Judge.

**BALMER, C. J.**

The Governor has the power to grant clemency, including pardons, commutations, and reprieves, pursuant to Article V, section 14, of the Oregon Constitution.[1] This case requires us to determine what constitutes a reprieve under that constitutional provision. Specifically, we must decide whether a reprieve must have a stated end date, whether it may be granted only for particular purposes, and whether it must be accepted by the recipient to be effective.

After this court affirmed Gary Haugen's aggravated murder conviction and death sentence, he decided not to pursue further appeals, and the trial court set an execution date. Governor Kitzhaber subsequently issued a reprieve pursuant to Article V, section 14, suspending Haugen's death sentence for the duration of Kitzhaber's service as Governor. Haugen purported to reject that grant of clemency. He sought a judgment declaring the reprieve ineffective and invalid, arguing that a reprieve must be accepted to be effective, or, alternatively, that the Governor's action did not qualify as a reprieve. The trial court agreed that a reprieve must be accepted to be effective and accordingly ruled the Governor's grant of clemency ineffective because Haugen had rejected it. The Governor appealed, the Court of Appeals certified the appeal to this court, and this court accepted the certification. *See* ORS 19.405 (procedures for certification of appeal).[2] For the reasons set forth below, we conclude that the reprieve is valid and effective. Accordingly, we reverse the judgment of the trial court.

## I.  FACTS AND PROCEEDINGS BELOW

The facts are undisputed. Gary Haugen has been an inmate in the Oregon State Penitentiary since 1981, when he was convicted of murder and sentenced to life in

---

[1] Article V, section 14, provides, in part: "He [the Governor] shall have power to grant reprieves, commutations, and pardons, after conviction, for all offences [*sic*] except treason, subject to such regulations as may be provided by law."

[2] ORS 19.405(1) provides, in part: "When the Court of Appeals has jurisdiction of an appeal, the court, through the Chief Judge and pursuant to appellate rules, may certify the appeal to the Supreme Court in lieu of disposition by the Court of Appeals." Under ORS 19.405(2), "The Supreme Court *** may accept or deny acceptance of the certified appeal."

prison. In 2007, while he was serving that sentence, a jury convicted Haugen of aggravated murder for the murder of a fellow inmate, and the jury sentenced Haugen to death. This court affirmed the judgment of conviction and sentence of death. *State v. Haugen*, 349 Or 174, 176, 243 P3d 31 (2010).

After this court affirmed Haugen's conviction and sentence, he decided not to pursue any further appeals. Following two death warrant hearings, the trial court set an execution date of December 6, 2011. Before that date, Governor Kitzhaber issued a reprieve, which read, in part:

"WHEREAS, Oregon's application of the death penalty is not fairly and consistently applied, and I do not believe that state-sponsored executions bring justice;

"NOW, THEREFORE, by virtue of the authority vested in me by Article V, Section 14 of the Oregon Constitution, I, John A. Kitzhaber, MD, Governor of the State of Oregon, hereby grant Gary D. Haugen a temporary reprieve of the aforementioned death sentence for the duration of my service as Governor."

In response, Haugen sent a letter to Governor Kitzhaber purporting to reject the reprieve. He also filed a declaratory judgment action seeking a declaration that the reprieve was ineffective and invalid. In his complaint, he again purported to reject the reprieve. Haugen then alleged that the Governor's action was beyond his constitutional authority because the reprieve did not last for a definite period of time, was not granted based on Haugen's particular circumstances, and suspended the operation of laws based on the Governor's moral opposition to those laws. Haugen also argued that the reprieve was ineffective because a reprieve must be accepted to be effective. The Governor responded that the reprieve was properly granted under Article V, section 14, and was effective regardless of Haugen's purported rejection of it.

The trial court granted Haugen's motion for judgment on the pleadings. The court first concluded that the reprieve was not required to specify a particular date when it would expire, because it was limited to the duration of Governor Kitzhaber's service and therefore was temporary, "as is necessary to define the clemency as a reprieve." The

court also reasoned that commutation of Haugen's sentence to life in prison would be the functional equivalent of an indefinite reprieve, and the court stated that "there is no question" that the Governor possesses the power to commute a sentence to life in prison. Thus, the court determined, the reprieve was not required to have a specified end date.

In addressing Haugen's acceptance theory, the trial court traced federal and state case law involving pardons and other acts of clemency.[3] As discussed more fully below, some federal and state cases suggest that certain acts of clemency must be accepted to be effective. Although at least one United States Supreme Court case, *Biddle v. Perovich*, 274 US 480, 47 S Ct 664, 71 L Ed 1161 (1927), expressly rejected that proposition in the context of the federal clemency power, the trial court determined that no Oregon case had relied on *Biddle* and that, following *Biddle*, at least one Oregon case had continued to adhere to the acceptance theory discussed in prior United States Supreme Court cases. The trial court therefore concluded that Haugen "has the right to reject Governor Kitzhaber's reprieve, and *** absent acceptance a reprieve is ineffective. Because [Haugen] has unequivocally rejected the reprieve, it is therefore ineffective." Governor Kitzhaber appealed, the Court of Appeals certified the appeal to this court, and this court accepted the certification.

## II.   JUDICIAL REVIEW OF THE GOVERNOR'S CLEMENCY POWER

Before addressing the merits of the case, we must determine whether we have authority to decide this case, which involves the exercise of an important governmental power that the constitution entrusts to the Governor.

The "chief executive power" of the state is vested in the Governor, Or Const, Art V, § 1, and because the Governor is the head of an equal branch of government, this court must not "assume the power to question the action of the

---

[3]  Although pardons, commutations, and reprieves have distinct characteristics, they often are referred to collectively as "acts of clemency," and the executive's power to grant them is referred to as the "clemency power" or "pardon power." We follow that convention here and distinguish between the three different types of clemency only when necessary to highlight their specific meanings.

executive of the state." *Putnam v. Norblad*, 134 Or 433, 439, 293 P 940 (1930). Moreover, the Governor is responsible for determining the constitutionality of his actions in the first instance, and, to the extent that this court may review those actions, the court does so with that consideration in mind. *See Lipscomb v. State Bd. of Higher Ed.*, 305 Or 472, 478-79, 753 P2d 939 (1988) ("Governors, legislators, and other public officials are responsible in the first instance for determining their constitutional duties[.]"). That principle, however, does not exempt the Governor's actions from judicial review. *See id.* at 476-77, 479 (declining to adopt argument that the court should defer to the Governor's understanding of his constitutional powers if that understanding is "arguably correct," because "[p]olitical institutions like any others may adapt to erroneous practices that should not be sustained"). For example, in *Lipscomb*, notwithstanding the constitution's allocation to the Governor of the power to veto legislation, this court considered whether the Governor's power to veto provisions in bills declaring an emergency permitted the Governor to veto any provision in such a bill, or to veto only the emergency clause. *Id.* at 474.

In this case, the parties' dispute regarding this court's authority centers on the *scope* of the court's authority, rather than on whether this court has authority to decide the case at all. Haugen argues that, even if the court cannot review the Governor's discretionary decision to exercise the clemency power in a particular case, nothing prevents this court from making the threshold determination of what qualifies as a reprieve. The Governor agrees that the court has authority to decide this case, but argues that, in doing so, the court does not have the authority to review the Governor's reasons for granting the reprieve.

We previously have stated that "it is not within judicial competency to control, interfere with, or even to advise the Governor when exercising his power to grant reprieves, commutations, and pardons." *Eacret et ux v. Holmes*, 215 Or 121, 125-26, 333 P2d 741 (1958). That does not mean, however, that the Governor's clemency power—any more than the Governor's veto power reviewed in *Lipscomb*—is

completely beyond the scope of judicial review. *See Lipscomb*, 305 Or at 477 n 4 ("[N]o official can invoke either 'policy' or 'politics' to avoid review of actions not authorized by law[.]"). As discussed more fully below, this court has reviewed the validity of certain aspects of acts of clemency in the past. *See, e.g.*, *Ex Parte Houghton*, 49 Or 232, 234-36, 89 P 801 (1907) (concluding that the Governor may attach conditions to a pardon and may enforce those conditions).

What this court has not reviewed is the Governor's exercise of discretion in invoking the clemency power, including the Governor's reasons for invoking that power. *Eacret*, 215 Or at 127 (noting that the Governor's "discretion can not [*sic*] be controlled by judicial decision"). In *Eacret*, this court affirmed the dismissal of a complaint filed by a murder victim's parents, who were seeking a judgment declaring that the Governor could not exercise his power to commute a death sentence because of his "conviction that the death penalty is wrong." *Id.* at 124. The parents sought to limit the Governor's clemency power so that it could be exercised based only on "considerations of justice in the particular case." *Id.* Thus, the parents sought to limit the Governor's exercise of discretion in determining both who deserved clemency and why the Governor would exercise that power. This court, however, declined to impose such limitations.[4]

In this case, Haugen does not ask the court to limit the Governor's discretion in invoking the clemency power and instead asks the court to interpret the meaning of "reprieve" in Article V, section 14, of the Oregon Constitution. One of this court's fundamental functions is interpreting provisions of the Oregon Constitution. *See [Farmers Ins. Co. v. Mowry](Farmers Ins. Co. v. Mowry)*, 350 Or 686, 697, 261 P3d 1 (2011) (noting that "this court is the ultimate interpreter of state constitutional provisions— subject only to constitutional amendment by the people"). We conclude that we may reach the merits of the parties' arguments regarding what constitutes a reprieve.

---

[4] The court determined that the parents lacked standing to maintain the suit against the Governor, but then went on to discuss principles of judicial review in relation to the Article V, section 14, clemency power. *Eacret*, 215 Or at 124-28.

### III.   ANALYSIS OF THE ARTICLE V, SECTION 14, CLEMENCY POWER

Article V, section 14, of the Oregon Constitution, quoted in full below, provides, in part, that the Governor "shall have power to grant reprieves, commutations, and pardons, after conviction, for all offences [*sic*] except treason, subject to such regulations as may be provided by law." Although this court previously has decided cases involving Article V, section 14, the court has not analyzed that provision using the principles described in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), for interpreting original constitutional provisions. In undertaking that analysis, this court examines the text of the constitutional provision, the historical circumstances surrounding its adoption, and the case law, *id.*, with the goal of identifying "the historical principles embodied in the constitutional text" and then applying those principles "faithfully to modern circumstances." *Coast Range Conifers v. Board of Forestry*, 339 Or 136, 142, 117 P3d 990 (2005).

The Governor argues that the text, context, historical circumstances, and case law surrounding Article V, section 14, of the Oregon Constitution demonstrate that the Governor's power to grant clemency under that provision is plenary. The recipient of a grant of clemency, the Governor argues, has no power to reject it, except, perhaps, in cases where the grant of clemency requires the recipient to fulfill a condition, which the recipient can decide to fulfill or not. In making that argument, the Governor traces the development of the clemency power from its English roots to the adoption of Article V, section 14, of the Oregon Constitution. The Governor also examines—and distinguishes—both federal and state case law addressing the clemency power, noting that no case has directly addressed the issue presented here.

Haugen responds by renewing the arguments that he made before the trial court. The reprieve exceeds the Governor's authority, he argues, because the reprieve lacks an expiration date, is not based on Haugen's individual circumstances, and operates to suspend laws that the Governor morally opposes. Moreover, he argues, cases from this court and the United States Supreme Court demonstrate that a grant of clemency must be accepted by the recipient

to be effective, and those cases do not limit the acceptance requirement to conditional acts of clemency. Alternatively, Haugen argues, the Governor's reprieve creates uncertainty surrounding whether and when he will be put to death. That uncertainty, he maintains, constitutes cruel and unusual punishment that violates the Eighth Amendment to the United States Constitution and deprives him of his liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[5]

Because this court has not previously applied the *Priest* analysis to Article V, section 14, we begin with the text and history of that provision, and then examine this court's prior cases in light of the textual and historical analysis. After resolving the state constitutional issue, we turn to Haugen's federal claims. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (court addresses state constitutional issues before reaching federal constitutional issues).

A.  *Text and Context of Article V, Section 14*

Article V, section 14, of the Oregon Constitution provides:

> "He [the Governor] shall have power to grant reprieves, commutations, and pardons, after conviction, for all offences [*sic*] except treason, subject to such regulations as may be provided by law. Upon conviction for treason he shall have power to suspend the execution of the sentence until the case shall be reported to the Legislative Assembly, at its next meeting, when the Legislative Assembly shall either grant a pardon, commute the sentence, direct the execution of the sentence, or grant a farther [*sic*] reprieve.

> "He shall have power to remit fines, and forfeitures, under such regulations as may be prescribed by law; and shall report to the Legislative Assembly at its next meeting each case of reprieve, commutation, or pardon granted, and the reasons for granting the same; and also the names of all persons in whose favor remission of fines, and forfeitures shall have been made, and the several amounts remitted[.]"

---

[5] The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Fourteenth Amendment provides, in part, that no state shall "deprive any person of life, liberty, or property, without due process of law."

The Oregon Constitution does not define the word "reprieve," and historical definitions of the word provide little insight into the limitations, if any, on what qualifies as a reprieve. Instead, most definitions merely note that a reprieve is temporary and delays execution of the recipient's sentence. For example, a typical definition notes that "this term is derived from reprendre, to take back, and signifies the withdrawing of a sentence for an interval of time, and operates in delay of execution." John Bouvier, 2 *A Law Dictionary* 358 (1839); *see also* William Blackstone, 4 *Commentaries on the Laws of England* 387 (1769) ("A reprieve, from *reprendre*, to take back, is the withdrawing of a sentence for an interval of time; whereby the execution is suspended."); Noah Webster, 2 *An American Dictionary of the English Language* (unpaginated) (1828) (defining a reprieve as "[t]he temporary suspension of the execution of sentence of death on a criminal"). None of those definitions requires a reprieve to have a specified end date—a reprieve is "temporary" and operates "for an interval of time," but need not identify the end date of that interval, as long as there is a definite end. Moreover, those definitions do not indicate that a reprieve may be granted only for a particular purpose; instead, they define the word "reprieve" by its effect, namely, the delay of execution of the recipient's sentence.

Furthermore, none of the definitions that the parties identify requires a reprieve to be accepted by the recipient to be effective. In fact, the origin of the word—from the French "*reprendre*," meaning, "to take back"—suggests that the Governor can unilaterally "take back" the sentence imposed, rather than offering to delay execution of the sentence subject to the recipient's acceptance. In contrast, at least one historical definition of "pardon" expressly notes that a valid pardon requires acceptance. Bouvier, 2 *A Law Dictionary* at 215 ("To make it valid, the pardon must be accepted."). *But see* Webster, 2 *An American Dictionary of the English Language* (unpaginated) (providing definition of "pardon" that does not mention acceptance). We need not—and do not—decide whether a *pardon* must be accepted to be valid. We note only that none of the definitions of "reprieve" contains a similar notion of acceptance.

The word "reprieve," of course, does not appear in isolation in Article V, section 14, and the text surrounding that word provides important context. The Governor has authority to "grant" reprieves. The use of the word "grant," in some ways, is consistent with Haugen's acceptance argument, which relies in part on the United States Supreme Court's characterization of a pardon as similar to a deed conveying property, which is valid only if accepted. *See United States v. Wilson*, 32 US 150, 161, 8 L Ed 640 (1833) ("A pardon is a deed, to the validity of which, delivery is essential, and delivery is not complete, without acceptance."). At the time that the Oregon Constitution was adopted, the word "grant" was commonly used to refer to property conveyances. *See, e.g.*, Webster, 1 *An American Dictionary of the English Language* (unpaginated) (defining "grant" as "[t]o give; to bestow or confer on without compensation, particularly in answer to prayer or request[,]" or "[t]o transfer the title of a thing to another, for a good or valuable consideration; to convey by deed or writing"); Bouvier, 1 *A Law Dictionary* at 449 ("Technically speaking, grants are applicable to the conveyance of incorporeal rights, though in the largest sense, the term comprehends every thing that is granted or passed from one to another, and is applied to every species of property."); Alexander M. Burrill, 1 *A New Law Dictionary and Glossary* 548 (1850) (defining "to grant" as "[a]n operative word of conveyance, particularly appropriate to deeds of grant, properly so called, but used in other conveyances also, such as deeds of bargain and sale, and leases"). As the United States Supreme Court suggested in *Wilson*, property conveyances may require acceptance. Thus, the word "grant" provides at least some contextual support for Haugen's argument that, although the Governor can attempt to "convey" an act of clemency to a person, the person must accept that clemency for it to be effective.

The use of the word "grant," however, does not, in and of itself, convert an act of clemency into property to be conveyed subject to acceptance, particularly when viewed in full context: "[The Governor] shall have *power* to grant reprieves, commutations, and pardons[.]" Or Const, Art V, § 14 (emphasis added). If the grant of clemency could be rejected, the Governor's "power" would be more akin to the

authority to make an offer, rather than the source of the Governor's unilateral ability to set aside or suspend a criminal sentence. It is unlikely that the framers intended the word "power" to have such a diminished meaning. The original text of Article V, which discusses the executive branch, used the word "power" to describe the Governor's clemency authority (and generally to vest the "chief executive power" of the state in the Governor, Or Const, Art V, § 1) and not to describe any of the other responsibilities of the Governor.[6] The Governor's ability to grant clemency is a direct and complete check on specific actions of the judicial branch that is entrusted to the chief executive. Accordingly, to the extent that limits are imposed on the clemency power, those limits must come from the constitution itself, or from the people. *See Schick v. Reed*, 419 US 256, 267, 95 S Ct 379, 42 L Ed 2d 430 (1974) ("[T]he pardoning power is an enumerated power of the Constitution and *** its limitations, if any, must be found in the Constitution itself.").

The Oregon Constitution does not provide the recipient of a Governor's act of clemency with a corresponding individual right to reject that clemency. In fact, in describing the Governor's power to grant pardons, commutations, and reprieves, the constitutional text does not refer to the recipient of the grant of clemency at all. To the extent that Article V, section 14, contemplates any limitation on the Governor's power, the constitution expressly entrusts those limits to the legislative branch of government. The legislature can regulate the Governor's clemency power, because that power is "subject to such regulations as may

---

[6] Since statehood, the Governor has had the authority to veto bills, but that authority was not phrased as a "power." *Former* Or Const, Art V, § 15 (1857), *renumbered as* Or Const, Art V, § 15b (1916) ("Every bill which shall have passed the Legislative Assembly, shall, before it becomes a law be presented to the Governor, if he approve he shall sign it; but if not, he shall return it with his objections, to that house in which it shall have originated, which house shall enter the objections at large upon the journal, and proceed to reconsider it."). In 1916, the people added Article V, section 15a, to the Oregon Constitution, which provided, "The Governor shall have *power* to veto single items in appropriation bills." (Emphasis added.) In addition, some of the Governor's responsibilities enumerated outside of Article V were articulated as "powers." *See, e.g.*, Or Const, Art VIII, § 1 ("The Governor shall be superintendent of public instruction, and his *powers*, and duties in that capacity shall be such as may be prescribed by law; but after the term of five years from the adoption of this Constitution, it shall be competent for the Legislative Assembly to provide by law for the election of a superintendent[.]" (Emphasis added.)).

be provided by law."[7] Or Const, Art V, § 14. The constitution does not provide the recipient of an act of clemency with a similar means of regulating the Governor's power, whether through a requirement of acceptance or some other means.

The Oregon Constitution gives the legislature an additional check on the Governor's clemency power in treason cases. In contrast to the President's clemency power[8]—which extends to all "[o]ffences against the United States" except those involving impeachment—in cases of treason, the Governor essentially can grant only a reprieve, rather than a commutation or pardon, and the reprieve is effective only until the legislature's next meeting. That is, the Governor's power is limited to "suspend[ing] the execution of the sentence" in a treason case, but only "until the case [is] reported to the Legislative Assembly, at its next meeting." Or Const, Art V, § 14. At that point, the Legislative Assembly decides whether to grant a pardon, commutation, or reprieve, or whether to "direct the execution of the sentence." *Id.* In effect, in cases of treason, the Governor makes the initial clemency decision, and the legislature ultimately determines whether and what kind of clemency is appropriate. The express limitation in the constitution on the Governor's clemency power in cases of treason supports the Governor's argument that, in all other cases, his power is plenary.

---

[7] The legislature has enacted a small number of statutory provisions addressing the clemency power. ORS 144.649 - 144.670. Most of those provisions address procedural issues, such as the procedure for reporting acts of clemency to the legislature and the procedure for applying for clemency. The lone provision addressing the scope of the Governor's power, ORS 144.649, restates the Governor's constitutional power, but also expresses the legislature's intent to defer to the Governor's judgment regarding the exercise of that power:

"Upon such conditions and with such restrictions and limitations as the Governor thinks proper, the Governor may grant reprieves, commutations and pardons, after convictions, for all crimes and may remit, after judgment therefor, all penalties and forfeitures."

*See also Houghton*, 49 Or at 234 (noting that similar language in earlier enacted provision "is but a restatement of the law as it exists without legislative action").

[8] The President's clemency power is set forth in Article II, section 2, of the United States Constitution, which provides, in part:

"The President shall *** have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment."

The President's clemency power also is broader than the Governor's power in that the President can grant clemency at any time, while the Governor can grant clemency only "after conviction." Or Const, Art V, § 14.

Haugen argues that other constitutional provisions provide additional insight into what constitutes a reprieve. In particular, he argues that the Governor's primary duty is to "take care that the Laws be faithfully executed," Or Const, Art V, § 10, and that only the legislature has the power to suspend the operation of the laws. *See* Or Const, Art I, § 22 ("The operation of the laws shall never be suspended, except by the Authority of the Legislative Assembly."). Based on those provisions, Haugen reasons that the framers would not have intended for a reprieve to have the effect of suspending the operation of the laws. He argues that the Governor's purported reprieve suspends the operation of the laws by effectively preventing a death sentence from being carried out in accordance with ORS 137.463 to 137.482, and therefore it is not a reprieve. Although Haugen acknowledges that any reprieve may temporarily "interrupt" the operation of the laws, he argues that the Governor's reprieve in this case *suspends* the laws because the reprieve lacks an expiration date and is aimed at the laws, rather than at Haugen himself.

As an initial matter, even if the constitutional provisions that Haugen cites required a reprieve to have an expiration date, the reprieve granted to Haugen would satisfy that requirement. As noted, the reprieve expires at the end of Kitzhaber's service as Governor. Although Haugen is correct that the expiration of the Governor's service could occur at different points in time—such as through death, resignation, or expiration of his term of office—he does not dispute that Kitzhaber's service as Governor will end, at which point Haugen's sentence will be reinstated. Even if the Governor's reprieve is aimed at laws that he believes are unjust or immoral, rather than at Haugen's specific circumstances, the *effect* of the reprieve here is the same as any other reprieve: Haugen's sentence is suspended during the period of the reprieve. When the reprieve expires at the end of the Governor's service, Haugen's sentence will be executed unless the Governor's successor grants another act of clemency. We agree with the Governor that the reprieve suspends Haugen's sentence, rather than the laws. The constitutional provisions that Haugen cites do not establish that a reprieve must have a stated expiration date or cannot

be aimed at the laws, as long as its effect is to temporarily suspend the execution of a sentence, as is the case here.

In sum, the text and context of Article V, section 14, do not require a reprieve to specify an end date, nor do they limit the Governor to granting reprieves only for a particular purpose, as long as the effect of the reprieve is to delay, temporarily, the execution of the sentence. Moreover, the text and context do not indicate that a reprieve must be accepted for it to be effective. Nothing inherent in the word "reprieve" requires the recipient's acceptance for the reprieve to be effective. Although the word "grant" suggests that the intended recipient must acquiesce in the reprieve, interpreting "grant" that way would deprive the word "power" of much of its meaning.

B.  *Discussion of Article V, Section 14, at the Constitutional Convention*

To better understand the scope of the Governor's clemency power, we turn to its history. The framers did not devote much time to debating Article V, section 14. They did, however, discuss a provision that would have provided the legislature with an additional check on the Governor's power. As originally introduced, Article V, section 14, contained a provision that permitted the legislature to "constitute a council, to be composed of officers of State without whose advice and consent the governor shall not have power to grant pardons in any case, except such as may by law be left to his sole power." Claudia Burton, *A Legislative History of the Oregon Constitution of 1857—Part II* (Frame of Government: Articles III-VII), 39 Willamette L Rev 245, 365 (2003) (quoting Article on Executive Department (As Introduced) § 14 (1857)). One delegate moved to strike that provision, because it was "antiquated and old fogyish," "would increase the expense," and, most importantly, because "[h]e believed the responsibility should be imposed upon the governor alone, and that thus the power would be exercised more carefully, and with better judgment." *Id.* at 367 (quoting record of constitutional convention).   Another delegate opposed that change, reasoning that "the check would prove a salutary one." *Id.* Ultimately, that provision was removed from Article V, section 14. *Id.* Thus, the Oregon history,

although slim, indicates that the delegates considered and rejected additional limitations on the Governor's clemency power in favor of entrusting that power to the Governor alone. Moreover, in considering those limitations on the Governor's power, the delegates discussed and rejected the merits of a "check" by another branch of government, but did not even discuss whether a similar overriding right should be given to the recipient of the grant of clemency.

The limited debate at the constitutional convention did not include a discussion of the meaning of the term "reprieve." It may be that the delegates did not discuss the meaning of that term, or additional limitations on that term, because, as Haugen asserts, it had a well-understood meaning at the time that the constitution was adopted. *See Schick*, 419 US at 260 ("Although the authors of [the federal clemency] clause surely did not act thoughtlessly, neither did they devote extended debate to its meaning. This can be explained in large part by the fact that the draftsmen were well acquainted with the English Crown authority to alter and reduce punishments as it existed in 1787."). To determine if a well-established understanding of executive clemency power existed at the time that the Oregon Constitution was adopted, we must look beyond the constitutional convention. Because the federal clemency power was adopted about 70 years before the Oregon clemency power, and had been exercised by presidents in the years before Oregon adopted Article V, section 14, we examine the federal clemency power and its historical origins.[9]

C.   *English Common Law and the History of the Federal Clemency Power*

The federal clemency power derives from English common law. *See Schick*, 419 US at 266 (noting that Article II, section 2, of the United States Constitution "derives" from the English pardoning power, even though the federal clemency power now "flows" from the constitution); *Wilson*, 32 US at 160 (adopting English "principles respecting the operation and effect of a pardon"). As the "supreme

---

[9] As discussed more fully below, the federal clemency power also provides important context, because Oregon cases interpreting Article V, section 14, at times rely on federal cases interpreting the federal clemency power.

executive magistrate," the king was entrusted "with the power of extending mercy" by granting pardons or reprieves. Joseph Chitty, *A Treatise on the Law of the Prerogatives of the Crown and the Relative Duties and Rights of the Subject* 2, 89, 97 (1820). Not all the king's powers, however, were plenary. Although the British monarch's power was hereditary, that power—at least by the mid-eighteenth century—was considered to be vested in the king "by the general consent of the people, the evidence of which general consent is long and immemorial usage." William Blackstone, 1 *Commentaries on the Laws of England* 183-84 (1765). Accordingly, the king was expected to exercise his powers and prerogatives for the benefit of his subjects. Chitty, *Prerogatives* at 4 ("The splendour, rights, and powers of the Crown were attached to it for the benefit of the people, and not for the private gratification of the sovereign[.]" (Footnote omitted.)). Moreover, the king's power, to some extent, was checked by the legislative branch. *Id.* at 2 ("In [England], the legislative and executive authorities are wisely placed in different hands ***. [W]hen firmly and inalienably secured in separate hands, the different branches of government operate as a check on each other[.]").

Despite those limitations on the king's power, for a period of time in England, the king's power to pardon was absolute.[10] William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm & Mary L Rev 475, 487 (1977) ("[P]rior to the seventeenth century, the English monarch's power to pardon was absolute."). The power to grant pardons was the "act of [the king's] government, which [was] the most personal, and most entirely his own."

---

[10] Although there is some early discussion of the king's power to grant reprieves, historical discussions regarding the clemency power focus on the king's pardon power. That difference in treatment may stem from the fact that a pardon had greater implications, because of its permanency, than a reprieve. *See* Blackstone, 4 *Commentaries* at 387 (noting that a reprieve is only temporary while a pardon is permanent). Moreover, in England, judges also could grant reprieves, whereas the pardon power was entrusted to the king alone. *See* Joseph Chitty, 1 *A Practical Treatise on the Criminal Law* 757 (1841) (noting that a reprieve may be granted "by the favor of his majesty himself, or the judge before whom the prisoner is tried on his behalf"); Chitty, *Prerogatives* at 384 (noting that there are certain "supreme powers and prerogatives inherent in, and inseparably annexed to the royal character," including the power to pardon, which are "incommunicable" and "entrusted [to] the King alone").

Blackstone, 4 *Commentaries* at 389. The pardon power was considered "the most amiable prerogative of the crown," *id.*, and, as the king's prerogative, it was a right enjoyed by the king alone and not shared with his subjects. Blackstone, 1 *Commentaries* at 232 ("[F]or if once any one prerogative of the crown could be held in common with the subject, it would cease to be prerogative any longer."). Although there were certain limitations on the king's prerogative, there is no indication that a recipient of clemency could limit the king's prerogative to grant clemency by rejecting an unconditional pardon. *See* Chitty, *Prerogatives* at 7-8 (discussing "boundaries" on the "royal prerogative" and noting that the king "may pardon offenders, but cannot prejudice civil rights and remedies," without noting other limitations on that prerogative). Thus, under that conception of clemency, a recipient's acceptance would not be required for an unconditional grant of clemency to be effective.

Starting in the late seventeenth century, some limits were placed on the king's clemency power. *See* Duker, 18 Wm & Mary L Rev at 487 (noting limits imposed in the seventeenth century); Blackstone, 4 *Commentaries* at 393 (listing limits imposed by statute on pardon for treason, murder, and rape). Moreover, when the king attached certain conditions to his grant of clemency, some authorities suggest that those conditions had to be accepted for the grant of clemency to be effective. *See, e.g.*, *Schick*, 419 US at 261 (noting that "[t]he idea later developed that the subject's consent to transportation [as a condition of a pardon] was necessary, but in most cases he was simply 'agreeing' that his life should be spared"). At least in some circumstances, however, "the requirement of consent was a legal fiction at best." *Id.* (discussing clemency conditioned on transportation to another place). Thus, in large part, "by 1787 the English prerogative to pardon was unfettered except for a few specifically enumerated limitations." *Id.* at 262.

No authority indicates that those specifically enumerated limitations included limitations on the *reasons* for which the king could grant clemency or, more specifically, reprieves. Although, as Haugen asserts, several recurring reasons tended to be the reason for granting reprieves, nothing suggests that an act of clemency had to

be granted for one of those historical reasons to qualify as a reprieve. *Compare* Chitty, *Prerogatives* at 97 (noting that a reprieve may be granted "from the regular operation of law in circumstances which render an immediate execution inconsistent with humanity or justice") *and* Blackstone, 4 *Commentaries* at 387-88 (noting that reprieves may be granted if a person sentenced to death is pregnant or insane) *with* Blackstone, 4 *Commentaries* at 390 (noting that "it [is] in [the king's] power to extend mercy, wherever he thinks it is deserved") *and* Chitty, 1 *Practical Treatise* at 758 (noting that "[t]his temporary mercy [of a reprieve] may be extended *ex mandatio regis*, or from the mere pleasure of the crown"). Moreover, nothing suggests that reprieves were required to carry a stated end date. *See, e.g.*, Chitty, *Prerogatives* at 98 (noting that, after the king grants a reprieve, "the Judge of course grants the prisoner a respite, either for a limited time *or during the pleasure of his Majesty*" (emphasis added)).

Similarly, when the Crown delegated the clemency power to the executive authorities in the colonies, few limitations were imposed on that power. Duker, 18 Wm & Mary L Rev at 497. Following the Revolutionary War, however, the states "drastically curtailed the powers of their suspect executives." *Id.* at 500. In doing so, the states did not provide *recipients* of acts of clemency with a right to nullify those acts by rejecting them, but rather "provided for the ascendency of the legislative branch" while weakening the executive clemency power. *Id.* The issue was one of the allocation of government power, rather than the creation of individual rights.

By the time that the Oregon Constitution was adopted in 1857, the United States Supreme Court had clarified in *Wilson*, 32 US 150, how the English common law had influenced interpretation of the federal constitutional clemency power. In *Wilson*, the President had granted a pardon of a defendant's death sentence, and the defendant chose not to raise that pardon as a bar during sentencing for other, related crimes. Chief Justice Marshall, writing for the Court, determined that the trial court should not take judicial notice of the pardon, because it had not been brought before the court. *Id.* at 163. In reaching that conclusion, the Court drew on English principles and looked to English law

"for the rules prescribing the manner in which [the pardon] is to be used by the person who would avail himself of it." *Id.* at 160. The *Wilson* court described those English principles:

> "A pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed. It is the private, though official, act of the executive magistrate, delivered to the individual for whose benefit it is intended, and not communicated officially to the court."

*Id.* at 160-61. Under that description of English common law, an act of clemency would not necessarily have to be accepted to be effective. In particular, the Court indicated that the pardon "exempts the individual" when it is "bestowed" on him, rather than exempting him only after he accepts the grant of clemency.

The Court, however, went on to analogize a pardon to a deed:

> "A pardon is a deed, to the validity of which, delivery is essential, and delivery is not complete, without acceptance. It may then be rejected by the person to whom it is tendered; and if it be rejected, we have discovered no power in a court to force it on him."

*Id.* at 161. That part of the opinion, of course, suggested that acceptance of a pardon is required for it to be effective. In applying that principle, the Court stated that, like a deed, a pardon must be brought before the court by motion, plea, or otherwise if it is going to serve as a bar to further sentencing. *Id.* at 161-62. Therefore, although there is strong language in *Wilson* regarding acceptance of a grant of clemency, the opinion also looked the other way, suggesting that clemency can be effective absent consent. The inconsistent passages in *Wilson*, particularly when considered in light of the other historical evidence, indicate that, at the time the Oregon Constitution was adopted, there was some support, but not necessarily a well-established understanding, for the view that grants of clemency required acceptance to be effective.

In sum, neither the text nor the historical circumstances surrounding Article V, section 14, unequivocally requires an act of clemency to be accepted by the recipient

to be effective; nor do they require an act of clemency to have a stated end date or to be granted only for a particular purpose. We turn to the case law interpreting Article V, section 14, to determine whether it resolves those issues. Because many of Oregon's cases interpreting the clemency power rely on federal cases, we begin with those federal cases.

D.   *Federal Case Law Interpreting the President's Clemency Power*

The United States Supreme Court first interpreted the President's clemency power in 1833, in *Wilson*, 32 US 150. As noted, in that case, the President had granted a pardon of the defendant's death sentence, but the defendant chose not to raise that pardon as a bar during sentencing for other, related crimes. The Court held that the defendant could not benefit from the pardon in his sentencing for those other crimes, because he had not raised the pardon before the trial court.

It is important to understand what *Wilson* did *not* address. Unlike Haugen, the defendant in *Wilson* did not attempt to reject the grant of clemency from his death sentence; rather, he chose not to raise that grant of clemency as a bar to sentencing on related charges. In addition, as mentioned above, although the Supreme Court indicated that a pardon must be accepted to be effective, it reached that conclusion by analogizing a pardon to a private deed. *Id.* at 161. In analogizing a pardon to a deed, the Court reasoned that the pardon, "like any other deed," had to be brought before the court. *Id.* dThe Court did not conclude, let alone hold, that all grants of clemency are valid only if accepted. That was not the issue before the Court in *Wilson*.

Despite those caveats, *Wilson* has been cited for the proposition that a pardon is valid only if accepted. The United States Supreme Court affirmed the acceptance requirement in *Burdick v. United States*, 236 US 79, 35 S Ct 267, 59 L Ed 476 (1915). In that case, Burdick, an editor for the New York Tribune, refused to answer questions before a grand jury regarding his sources for articles about a fraud case that was under investigation. *Id.* at 84-85. Burdick refused to testify because he said his answers might incriminate him.

*Id.* at 85. In response, the President granted Burdick "'a full and unconditional pardon for all offenses against the United States which he \* \* \* has committed or may have committed, or taken part in'" in the publication of the fraud articles. *Id.* at 86 (quoting pardon). Burdick declined the pardon and continued to refuse to testify, and the court held him in contempt. *Id.* at 86-87. Thus, the question directly presented in that case was the effect of an unaccepted pardon—that is, whether acceptance of a pardon is necessary for it to be effective. *Id.* at 87-88. Relying on *Wilson*, the Court declared

> "[t]hat a pardon by its mere issue has automatic effect resistless by him to whom it is tendered, forcing upon him by mere executive power whatever consequences it may have or however he may regard it \* \* \* was rejected by the court [in *Wilson*] with particularity and emphasis. The decision is unmistakable."

*Id.* at 90. Thus, in *Burdick*, the Court squarely held that a pardon must be accepted by the recipient to be effective. Accordingly, the Court dismissed the contempt proceedings against Burdick.

The Supreme Court backed away from the acceptance requirement in a later case, however, specifically stating that a grant of clemency does not require the recipient's consent to be effective. In *Biddle*, the defendant was sentenced to death following a murder conviction, and the President commuted the sentence to life imprisonment "'in a penitentiary to be designated by the Attorney General of the United States.'" 274 US at 485 (quoting commutation). After the pardon was granted and the defendant had been transferred to a penitentiary, the defendant filed an application for a writ of habeas corpus, arguing that his transfer to a penitentiary was without his consent and that the President's commutation was beyond his legal authority. *Id.* The Court rejected the defendant's argument in an opinion by Justice Holmes. Although the Court did not cite *Wilson*, it rejected the often-cited principle from *Wilson* that a pardon is a private act of grace:

> "A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public

welfare will be better served by inflicting less than what the judgment fixed. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent, determines what shall be done."

*Id.* at 486 (citation omitted). In rejecting the characterization of a grant of clemency as a "private act of grace," the Court explicitly rejected the *Wilson* court's corresponding characterization of a pardon as a private deed requiring acceptance. The *Biddle* court reasoned that requiring the recipient's consent effectively would deprive the President of his power to grant clemency. *Id.* at 487 (concluding that requiring consent "would permit the President to decide that justice requires the diminution of a term *** without consulting the convict, but would deprive him of the power in the most important cases and require him to permit an execution which he had decided ought not to take place," in the absence of the recipient's consent to the clemency).[11] Thus, *Biddle* rejected the acceptance requirement suggested in *Wilson*.

Haugen argues that *Biddle* is not persuasive, because this court consistently has relied on the rationale set forth in *Wilson* when interpreting Article V, section 14, of the Oregon Constitution. Haugen notes that, even after the United States Supreme Court rejected *Wilson*'s characterization of clemency as a "private act of grace" in *Biddle*, this court continued to cite and rely on *Wilson*. *See Fredericks v. Gladden*, 211 Or 312, 323, 315 P2d 1010 (1957). Haugen reasons that, under this court's existing cases and *Wilson*, he can reject the Governor's reprieve because the Governor has not demonstrated why this court should overrule its prior decisions.

The Governor concedes that Oregon's case law has tracked early United States Supreme Court cases. The Governor argues, however, that none of the Oregon cases presents the issue raised here, namely, whether the recipient of an unconditional reprieve can render it ineffective by

---

[11] The *Biddle* court did not overrule *Burdick*, 236 US 79, and instead stated that the reasoning of *Burdick* "is not to be extended to the present case." *Biddle*, 274 US at 487-88. The Court did not elaborate or otherwise distinguish *Burdick*.

rejecting it. Therefore, according to the Governor, this court need not overrule any of its prior cases, because this is an issue of first impression. Moreover, the Governor notes, to the extent that the Oregon cases rely on *Wilson*, *Wilson* is not relevant to this case, because it merely addresses whether the court can take judicial notice of a pardon that the defendant did not bring before the court.[12] *Wilson*, the Governor asserts, did not address the broader question of whether a grant of clemency must be accepted to be effective.

E.   *Oregon Case Law Discussing the Governor's Clemency Power*

This court first discussed acceptance of a grant of clemency in *Houghton*, 49 Or 232. In *Houghton*, the Governor commuted Houghton's five-year sentence for robbery to a shorter term on the condition that Houghton "'remain a law-abiding citizen.'" *Id.* at 232 (quoting commutation). After Houghton's release, the Governor revoked the commutation, because he determined that Houghton had violated the condition when he was convicted of larceny. *Id.* at 233. Houghton challenged the Governor's decision, arguing that the Governor did not have the authority to grant conditional commutations and that the condition was therefore void, thus rendering the pardon absolute. *Id.* In considering that argument, the court assumed, without much discussion, that a grant of clemency could be rejected by the recipient. *Id.* at 234-35 (concluding that "under a constitution like ours a pardon is a mere act of grace" and that, in that case, "[t]he commutation was an act of grace or favor, and [Houghton] was not obliged to accept it unless he so desired"). The court made the same assumption in a similar case involving revocation of a conditional reprieve: *In re Petition of Dormitzer*, 119 Or 336, 249 P 639 (1926).[13]

---

[12] The Governor also argues that *Wilson* is distinguishable because it involved a pardon, and, according to the Governor, courts historically have treated pardons differently from other forms of clemency. Because we distinguish this court's reliance on *Wilson* on other grounds, we need not reach that argument.

[13] In *Dormitzer*, 119 Or 336, the Governor revoked the previously granted conditional reprieve when the defendant violated the condition, and the defendant argued that the Governor in fact had granted him an unconditional pardon. *Id.* at 338. This court determined that, even if the Governor had exceeded his authority in granting the "so-called reprieve," the defendant could not challenge the revocation because "[h]e accepted the favor of the Governor." *Id.* at 340. The

*Houghton* and *Dormitzer* are distinguishable from the present case. Both cases involved the Governor's *revocation* of a grant of clemency, rather than the effect of a recipient's rejection of that clemency. The defendants in those cases argued for the *effectiveness* of an act of clemency, not its invalidity. Moreover, unlike the reprieve at issue here, *Houghton* and *Dormitzer* involved conditional grants of clemency. We need not decide here whether a conditional grant of clemency requires acceptance to be effective; we note only that we need not extend the reasoning in *Houghton* and *Dormitzer* to this case because of the different nature of the clemency granted to Haugen. Here, the Governor's reprieve was unconditional; by its terms, it required no particular act by Haugen to be effective.

In addition, in treating an act of clemency as "a mere act of grace," this court in *Houghton* relied on cases from other states, as well as from the United States Supreme Court, but did not undertake its own analysis of Article V, section 14, of the Oregon Constitution. *See* 49 Or at 234 (citing multiple cases from other states and a case from the United States Supreme Court to support characterization of clemency as an act of grace that can be rejected). In *Dormitzer*, the court did not resolve whether the Governor's action in that case qualified as a reprieve, and the court did not analyze—or even refer to—Article V, section 14. Thus, *Houghton* and *Dormitzer* are of no assistance in resolving the issues presented in this case.

This court again assumed that a grant of clemency requires acceptance to be effective in *Carpenter v. Lord*, 88 Or 128, 171 P 577 (1918). Unlike *Houghton* and *Dormitzer*, however, *Carpenter* did not involve a grant of clemency. Carpenter had been convicted of a crime in Oregon and had been granted parole, but the Governor issued an executive warrant to have Carpenter delivered into the custody of an agent of the state of California, where charges also were pending against him. Carpenter challenged the Governor's ability to have him extradited to California. In examining that issue, this court discussed separation of powers and

---

court also rejected the defendant's argument that the reprieve prevented him from appealing, reasoning that he "had the right to accept or reject the 'reprieve.'" *Id.*

noted that the Governor could not "annul the action of the Circuit Court or * * * interfere with it in the execution of its own judgment." *Id.* at 137. The court acknowledged that the Governor could issue a pardon, but stated that "even that is not effective" unless accepted by the recipient. *Id.* The court went on to quote the language from *Wilson* characterizing a pardon as a deed that is valid only when accepted. *Id.* Although the court seemed to cite *Wilson* as a demonstration of the limits imposed on the Governor's clemency power, the case did not involve an act of clemency at all and, similarly to *Houghton* and *Dormitzer*, did not provide the court with an opportunity to engage in an independent analysis of the Governor's Article V, section 14, power.

Nonetheless, the court cited *Carpenter* and again cited *Wilson* when it discussed the clemency power in a later case involving statutory good time credits. In *Fredericks*, 211 Or 312, an inmate was released 15 months early due to a miscalculation of his statutory good time credits. The inmate was returned to prison when the mistake was discovered, and he petitioned for a writ of habeas corpus. On rehearing before this court, the defendant argued that the court had erred in its initial opinion when it determined that the defendant had been released pursuant to a statutory power granted to the Governor under the good time credits statute, rather than pursuant to the Governor's exercise of his constitutional power to grant clemency.[14] The court again concluded that the inmate was improperly released due to a miscalculation of his good time credits, and not because the Governor had granted him clemency. *Id.* at 317, 322.

In reaching that conclusion, the court noted that the Governor had not followed the necessary procedure for granting a pardon, and the court quoted from *Carpenter*, including the portion of *Carpenter* that quotes the *Wilson* court's characterization of a pardon as a deed requiring acceptance to be effective. *Id.* at 323, 325. Haugen argues that *Fredericks* is significant because this court continued

---

[14] Under the good time credit statute in place at the time, the Governor was required to approve the release of prisoners whose sentences had been completed due to reductions based on good time credits. *See Fredericks*, 211 Or at 322-23 (discussing statute).

to rely on *Wilson*," even though the United States Supreme Court essentially had rejected *Wilson*'s characterization of clemency 30 years earlier in *Biddle*. *See Id.* at 323. However, after quoting *Carpenter*, the court in *Fredericks* immediately proceeded to discuss good time credit statutes. The court did not provide any analysis of *Carpenter* or *Wilson*, did not apply the language that it quoted, and, other than quoting that text, did not endorse that language. Moreover, there was no contention in the case that a grant of clemency was ineffective because the recipient had rejected it; on the contrary, the recipient was arguing that the Governor *had* granted him clemency, rather than merely releasing him based on good time credits.

Haugen argues that this court in *Fredericks* likely quoted *Carpenter* in response to the dissent's assertion that the Governor possesses "complete" power of clemency that cannot be enlarged or infringed upon by the legislature. *Id.* at 327-28 (McAllister, J., dissenting). The majority, however, agreed that the Governor is vested with the "complete" power to grant clemency and determined that the legislature had not invaded that power. *Id.* at 319, 322. Thus, although the court in *Fredericks* quoted *Carpenter*, and in turn, *Wilson* rather than *Biddle*, the court's reason for quoting that language, at best, is unclear.

F.  *The Governor's Article V, Section 14, Power to Grant Reprieves*

In sum, a number of Oregon cases contain statements suggesting that a grant of clemency is effective only if accepted by the recipient. Moreover, several cases hold that the Governor can revoke a conditional grant of clemency if the recipient attempts to benefit from the clemency without complying with the condition. On close examination, however, none of the Oregon cases holds that an unconditional act of clemency is effective only on acceptance by the recipient. And, no Oregon case involves the situation presented here, in which a recipient has attempted to *reject* a grant of clemency.

In addition, as Haugen notes, to the extent that this court's cases indicate that acts of clemency are ineffective if rejected, the cases suggest that the recipient has that right

of rejection because grants of clemency are acts of grace. A grant of clemency may be an act of grace in some cases, but, as the Court stated in *Biddle*, under our constitutional scheme, a grant of clemency is not a "*private* act of grace from an individual *happening* to possess power," 274 US at 486 (emphases added). Rather, it is "part of the Constitutional scheme" and permits the chief executive to determine that "the public welfare will be better served" by clemency. *Id.*; *see also Eacret*, 215 Or at 126 (noting that "the pardoning power is not a power inherent in any officer of the state *** but by the constitutions of nearly all the states, it is conferred upon the executive or upon the executive acting in conjunction with a council, board or commission").

We recognize that, historically, governors and presidents have granted clemency for a wide range of reasons, including reasons that may be political, personal, or "private," and that many such decisions—such as Governor Kitzhaber's decision here—may be animated by both public and private concerns.[15] Nonetheless, the executive power to grant clemency flows from the constitution and is one of the Governor's only checks on another branch of government. As part of the system of checks and balances, the Governor's clemency power is far from private: It is an important part of the constitutional scheme envisioned by the framers.

Within that scheme, limits exist on the Governor's power. The most fundamental limit is imposed through the actions of the people, if they choose not to reelect the Governor. *See Eacret*, 215 Or at 128 (noting that, if the Governor abuses the clemency power, the people have recourse at the polls). Moreover, as the text, history, and case law surrounding Article V, section 14, demonstrate, the Governor's power

---

[15] In the reprieve, the Governor identified both public and personal reasons for granting the reprieve: "Oregon's application of the death penalty is not fairly and consistently applied, and I do not believe that state-sponsored executions bring justice[.]" On the same day that he issued the reprieve, the Governor also issued a statement on capital punishment that further explained why he decided to grant a reprieve to Haugen, again identifying both public and personal reasons for his decision. He discussed the two executions that were carried out during his first administration and noted that he regretted allowing those executions "both because of my own deep personal convictions about capital punishment and also because in practice Oregon has an expensive and unworkable system that fails to meet basic standards of justice."

may be checked by the legislative branch, as in cases of treason convictions and through the legislature's authority to establish regulations regarding the Governor's power. Nothing in the text of the Oregon Constitution, however, provides the recipient of a grant of clemency with a right to nullify it by rejecting it. To the extent that the history and case law provide limited support for such a right, they are based largely on English common law, which, although informative, does not delineate Oregon's constitutional clemency power.

We conclude that the Governor's reprieve of Haugen's death sentence is valid and effective, regardless of Haugen's acceptance of that reprieve. We agree with Justice Holmes' comment in *Biddle* that the Governor's power to grant the reprieve that he did here is

> "part of the Constitutional scheme. When [clemency is] granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent, determines what shall be done."

274 US at 486 (citation omitted).

We also reject Haugen's argument that the Governor's action did not qualify as a reprieve. As noted, even if a reprieve requires a definite end date, this reprieve satisfies that requirement, because it will end when Kitzhaber's service as Governor ends. In addition, Haugen's argument that a reprieve under Article V, section 14, may be granted only for the reasons that reprieves historically were granted is without support. Although there may have been certain common reasons for granting a reprieve in the past, nothing in the text, history, or case law indicates that a reprieve may be granted *only* for those historical reasons. Governor Kitzhaber stated that he granted the reprieve because of his view that the death penalty is not "fairly and consistently applied" and his personal belief that the death penalty does not "bring justice." He determined that those reasons were sufficient to issue a reprieve of Haugen's death sentence. We are not asked to, and we do not, review the

Governor's judgment in reaching that conclusion. The issue is whether the Governor's action was within his constitutional authority, and we conclude that it was.

## IV.   CRUEL AND UNUSUAL PUNISHMENT

Having determined that the Governor's reprieve is valid under the Oregon Constitution, we turn to Haugen's claim under the United States Constitution.[16] Haugen argues that the reprieve subjects him to an "indefinite, prolonged period" of uncertainty regarding whether and when he will be put to death, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause. The reprieve, Haugen argues, is an "additional punishment" that lacks any penological justification. The Governor responds that Haugen cites no authority for the proposition that uncertainty regarding the date of execution constitutes cruel and unusual punishment.

The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The United States Supreme Court has held that the Eighth Amendment prohibition on cruel and unusual punishment extends to punishments that are disproportionate to the crime. *Graham v. Florida*, 560 US 48, 130 S Ct 2011, 2021, 176 L Ed 2d 825 (2010) ("The concept of proportionality is central to the Eighth Amendment."). In addressing certain proportionality challenges to a category of punishment, the court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 130 S Ct at 2022 (internal quotation marks omitted). Then, based on "the standards elaborated by controlling precedents" and the Court's analysis of the Eighth

---

[16] In addition to the Eighth Amendment claim discussed below, Haugen asserts that the reprieve violates the Due Process Clause by depriving him of his liberty interest in his "basic autonomy as an individual" and his "inalienable right as a human being to form and then act according to his own conceptions about the intimate, unfathomable questions of life and death." He does not cite any authority in support of that assertion, nor does he cite any case in which the United States Supreme Court has recognized such a liberty interest or in which the Court has recognized that an act of clemency deprives the recipient of that asserted interest.

Amendment itself, the Court must determine whether the punishment violates the constitution. *Id.* (internal quotation marks omitted). In that second inquiry, the Court considers, among other things, "whether the challenged sentencing practice serves legitimate penological goals," because "[a] sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Id.* at 2026, 2028. For example, in *Graham*, the Court determined that there was no penological justification for sentencing juvenile nonhomicide offenders to life without parole. *Id.* at 2028.

The necessary predicate to Haugen's proportionality argument is that the reprieve is a punishment similar to a criminal sentence. The reprieve is a punishment, Haugen asserts, because it imposes an indefinite, prolonged period during which he will not know whether or when he will be put to death. As Haugen himself argues, however, a reprieve is the temporary *suspension* of a criminal sentence, not the imposition of a criminal sentence. It is contrary to the very definition of a reprieve to classify it as punishment. Moreover, it makes little sense to require a penological justification for the *suspension* of a criminal sentence, and Haugen cites no authority for imposing such a requirement.

We do not doubt that being on death row, awaiting possible execution, and facing uncertainty as to if, and when, that sentence might be carried out, exacts a toll on people, as at least some members of the Supreme Court have recognized. *See, e.g.*, *Knight v. Florida*, 528 US 990, 994, 120 S Ct 459, 145 L Ed 2d 370 (1999) (Breyer, J., dissenting from denial of certiorari) ("It is difficult to deny the suffering inherent in a prolonged wait for execution—a matter which courts and individual judges have long recognized."). The Court has not concluded, however, that the uncertainty accompanying that time on death row constitutes cruel and unusual punishment. Moreover, Haugen cites no case that suggests that a reprieve or other act of clemency qualifies as cruel and unusual punishment. Thus, we reject Haugen's Eighth Amendment challenge.[17]

---

[17] In *Brown v. Plata*, __ US __, 131 S Ct 1910, 1928, 179 L Ed 2d 969 (2011), the United States Supreme Court held that "[p]risoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment." In that case,

The judgment of the circuit court is reversed, and the case is remanded to the circuit court with instructions to enter judgment in accordance with this opinion.

the Court found that clear and convincing evidence supported the finding of a three-judge district court that prison overcrowding had led to Eighth Amendment violations. The Court held that a prison's failure to provide prisoners with "basic sustenance, including adequate medical care," constituted an Eighth Amendment violation. *Id.* Haugen does not argue that the reprieve in this case violates the Eighth Amendment because it is incompatible with the concept of human dignity (although he makes a related argument under the Fourteenth Amendment), or that the uncertainty associated with remaining on death row subject to a reprieve is akin to being deprived of basic sustenance.