But Florida does not use the least-restrictive means to pursue its interests in preventing possibly irresponsible citizens from choosing their leaders. "[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." Kusper , 414 U.S. at 58-59, 94 S.Ct. 303. "[W]e have required that States adopt the least drastic means to achieve their ends." Ill. State Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 185, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979).
Florida's vote-restoration scheme is crushingly restrictive. The scheme crumbles under strict scrutiny because it risks-if not covertly authorizes the practice of-arbitrary and discriminatory vote-restoration. When a scheme allows government officials to "do whatever [they] want," viewpoint discrimination can slip through the cracks of a seemingly impartial process. ECF No. 29, at ¶ 55. Such discrimination can lead to a denial of "the fruits of their association, to wit: [former felons'] political impact"-or widespread, insidious bias to benefit the Governor's political party. Touchston , 234 F.3d at 1154 (Tjoflat, J., dissenting). State officials' potential political, racial, or religious biases cannot poison the well of vote-restoration.
Viewpoint discrimination is deeply antithetical to the Constitution and our *1302 Nation's longstanding values. Reed v. Town of Gilbert , --- U.S. ----, 135 S.Ct. 2218, 2230, 192 L.Ed.2d 236 (2015) ("Government discrimination among viewpoints-or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'-is a 'more blatant' and 'egregious form of content discrimination.' ") (quoting Rosenberger v. Rector and Visitors of Univ. of Va. , 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ); see also Citizens United , 558 U.S. at 340, 130 S.Ct. 876 (stating that First Amendment "restrictions based on the identity of the speaker are all too often simply a means to control content"). Moreover, even the risk of viewpoint discrimination runs afoul of the First Amendment. Turner Broad. Sys. v. FCC , 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (stating that "[g]overnment action that stifles speech on account of its message ... pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion") (emphasis added); see also Forsyth Cty , 505 U.S. at 133 n.10, 112 S.Ct. 2395 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.").
In Florida, the risk of viewpoint discrimination is distressingly real. Plaintiffs identify several instances of former felons who professed political views amenable to the Board's members who then received voting rights, while those who expressed contrary political views to the Board were denied those same rights. Applicants-as well as their character witnesses-have routinely invoked their conservative beliefs and values to their benefit. See ECF No. 102, at 27-28 (listing examples of former felons having their rights restored after invoking their political beliefs).
Similar disparities arise when applicants criticize the system. For example, a Navy veteran decried felon disenfranchisement before the Governor rejected his application because of traffic infractions. Id. at 28-29. But ten former felons-who did not speak out against felony disenfranchisement-were re-enfranchised despite less-than-perfect traffic records. Id. at 31-32.
That's not all. Similar conduct can lead to different results in front of the Board. The Governor asked one former felon, Steven Warner, about an illegal vote he cast in 2010-before his voting rights were restored. ECF No. 29, at ¶ 65; ECF No. 101-159. "Actually, I voted for you," Warner responded. Id. The Governor restored Warner's voting rights. Id. But Plaintiffs identify five former felons who, at other points, were questioned about illegal ballots cast and then rejected on that basis. ECF No. 29, at ¶ 63. It is not lost on this Court that four of the five rejected applicants are African-American.[14]
It is of no consequence to this Court that "Plaintiffs have not pled any claim or advanced any argument that Defendants have ever actually engaged in such invidious discrimination." ECF No. 137, at 12. It is exactly that "Board members could engage in [unconstitutional, viewpoint-based]
*1303 discrimination," id. , that is so troublesome. See Forsyth Cty. , 505 U.S. at 133 n.10, 112 S.Ct. 2395.
The Governor has, by rule, "unfettered discretion to deny clemency at any time, for any reason. " Fla. R. Exec. Clemency 4 (emphasis added). This language indicates-in the clearest terms English allows-that nothing prevents this one official from abusing broad discretion. What's more, Plaintiffs offer more than enough examples for this Court to infer that such discrimination is not some cockamamie idea Plaintiffs cooked up.
The Defendants claim that individualized review is a laudable feature of the vote-restoration scheme. See, e.g. , ECF Nos. 103, at 27 and 141, at 10. Individualized review would certainly be less restrictive than unfettered discretion if, at the end of the day, such review meant anything. But the final decision-maker is the Clemency Board, and the Governor has de facto veto authority over anyone's restoration. All the component parts of the vote-restoration process that Defendants wave like shiny objects to distract from potential viewpoint discrimination-the investigations, case analyses, and hearings-mean nothing if the Governor alone has final authority to restore Plaintiffs' rights. Bd. of Regents of State Colls. v. Roth , 408 U.S. 564, 582, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("When a violation of First Amendment rights is alleged, the reasons for dismissal ... must be examined to see if the reasons given are only a cloak for activity or attitudes protected by the Constitution.").
The Defendants' most compelling argument to support the vote-restoration scheme is its classification as a form of executive clemency. This placement, Defendants argue, more or less immunizes the scheme from judicial review. ECF Nos. 103, at 14-16 and 141, at 9. It is, after all, well-settled that executive clemency decisions -including pardons-"are rarely, if ever, appropriate subjects for judicial review." Ohio Adult Parole Auth. v. Woodard , 523 U.S. 272, 275, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (quoting Conn. Bd. of Pardons v. Dumschat , 452 U.S. 458, 464, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) ). Here, however, this Court is not examining any specific decision of Florida's Clemency Board, but rather its structure and unfettered discretion in the re-enfranchisement context.
Even so, executive clemency is not immune from judicial review if it violates the Constitution. More than a century ago, the Supreme Court invalidated a pardon that President Wilson issued. Burdick v. United States , 236 U.S. 79, 95, 35 S.Ct. 267, 59 L.Ed. 476 (1915). The Court observed that while the Constitution provides the President a broad pardon power, individuals also have rights under the Fifth Amendment that cannot be violated. Id. at 93-94, 35 S.Ct. 267. A court's role should be "to preserve both [constitutional provisions],-to leave to each its proper place." Id. More recently, Chief Justice Burger echoed this reasoning, writing that executive officials may impose conditions on clemency decisions so long as "any condition ... does not otherwise offend the Constitution." Schick v. Reed , 419 U.S. 256, 266, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974). By extension, the clemency decision itself-the object of any condition-must abide by the Constitution.
Justice O'Connor has warned that executive clemency powers are not unlimited. "[A]lthough it is true that 'pardon and commutation decisions have not traditionally been the business of courts,' ... some minimal procedural safeguards apply to clemency proceedings. Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether *1304 to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." Woodard , 523 U.S. at 289, 118 S.Ct. 1244 (quoting Dumschat , 452 U.S. at 464, 101 S.Ct. 2460 ) (O'Connor, J., concurring) (emphasis in original). Clemency decisions perhaps driven by unconstitutional factors-race, religion, gender, or viewpoint-are worse than flipping coins.
Executive clemency by its mere existence cannot serve as a legitimate, let alone compelling, state interest. No serious person would argue that an act of executive clemency that, for example, is motivated by race cannot run afoul of the Constitution simply because it is an act of executive clemency. This Court recognizes the novelty of a challenge to an executive clemency scheme. But "it is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison , 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). And so, if a court finds unconstitutionality in an executive clemency scheme, its role is to strike the acts permitting the constitutional violation-not to declare its hands tied.
The unfettered discretion that the Clemency Board possesses over a former felon's re-enfranchisement violates the First Amendment. Accordingly, Plaintiffs' motion for summary judgment on Count One is GRANTED and Defendants' motion as it relates to Count One is DENIED .
D
In Count Three,[15] Plaintiffs argue that the Board's lack of clear time limits in processing and deciding clemency applications violates the First Amendment. ECF No. 29, at ¶¶ 102-12. Specifically, the absence of time limits "create[s] the risk of arbitrary delays and arbitrary continued disenfranchisement." Id. at ¶ 109. Defendants contend that the lack of time constraints "rationally advance[s] the State's valid interest 'in limiting the franchise to responsible voters.' " ECF No. 103, at 20 (quoting Shepherd , 575 F.2d at 1115 ). Determining who is a responsible voter cannot occur "without the passage of time." ECF No. 103, at 20.
No one disputes that government investigations and decision-making require some time. The concern is whether the absence of any time constraints, coupled with the "unfettered discretion" the Governor has "to deny clemency at any time, for any reason," can mask unconstitutional viewpoint discrimination. Fla. R. Exec. Clemency 4. Kicking the can down the road to get a better view of the applicant's remorse, lifestyle, or even to assuage a Board member's comfort level can disguise unconstitutional motives.
"A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." FW/PBS, Inc. v. City of Dallas , 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). This potential suppression includes the First Amendment right to free association and expression. Laws, regulations, and rules that " 'make[ ] the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official-as by requiring a permit or license which may be granted or withheld in the discretion of such official-is an unconstitutional censorship ... upon the enjoyment of those freedoms.' " Shuttlesworth v. City of Birmingham , 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (quoting Staub v. City of Baxley , 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) ). An official's "delay compels the speaker's silence."
*1305 Riley v. Nat'l Fed'n of the Blind of N.C., Inc. , 487 U.S. 781, 802, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).[16]
Here, Plaintiffs' protected expressive and associational activities are at risk of viewpoint discrimination because the Board may defer restoration of rights for years-or forever. Defendants cannot-whether arbitrarily or motivated by political, racial, or religious bias-kick the can down the road for so long that they violate former felons' rights to free association and free expression without offending the Constitution.
Indefinite can-kicking is not some Floridian fairytale like a line-less Space Mountain. The Board regularly invokes some unknown future date as the appropriate time to revisit a restoration denial. This date must be no earlier than two years from the effective denial but is nonetheless unspecified at the time of denial. Fla. R. Exec. Clemency 14. Plaintiffs identify multiple instances when Governor Bush required "more time" before rights are restored. ECF No. 102, at 39 (listing Board members' statements). In recent years, Governor Scott has also required more time before reapplication, from four years to 11, and, in one particularly punitive example, 50 years for a 54 year-old man. Id. at 39-41 (listing Board members' statements).
Sometimes Board members defer specifying any restoration timeline. See id. (listing Board members' statements). For example, ten years after her release from incarceration and shortly after her pregnant daughter spoke on her behalf before the Board, Governor Scott informed Plaintiff Virginia Kay Atkins that he did not feel "comfortable" restoring her rights. Id. at 41; ECF No. 101-155. Leon Gillis III explained to the Board that he was released from prison in 1985 but was nonetheless denied restoration on June 6, 2011 based on his illegal voting during the intervening 26 years. He pressed the Governor on when he could reapply: "What else am I supposed to do if I'm doing everything I'm supposed to do ... how long am I supposed to wait?" The Governor responded, "I could tell you that answer, but today I'm not, I don't feel comfortable doing it." ECF No. 101-140.
The lack of time limits in processing and deciding vote-restoration applications risks viewpoint discrimination and is therefore unconstitutional. Accordingly, Plaintiffs' motion for summary judgment on Count Three is GRANTED and Defendants' motion as it relates to Count Three is DENIED .
* * *
This Court finds untenable Defendants' belief that all the cherished First Amendment rights, values, traditions, and protections from state intrusion laid out in Section II.B, supra , are negated by the squid-like tendrils of an asterisk next to former felons' names-the asterisk of disenfranchisement *1306 authorized by three words in the Fourteenth Amendment's Section Two that, if Defendants had their way, would exclude millions of American men and women from basic First Amendment protection.
Only one wedded to the rotten landscape of a hyper-formalist worldview would claim that when a state strips the fundamental right to vote from its incarcerated citizens, it also strips all rights intertwined with voting-the right to associate in a political party, the ultimate expression in a democratic society, and "the fruits of their association, to wit: their political impact." Touchston , 234 F.3d at 1154 (Tjoflat, J., dissenting). It is legal chicanery to argue an individual convicted of a crime loses her First Amendment associational and expressive interests in the political sphere simply because these rights relate to voting. "Encouraging citizens to vote is a legitimate, indeed essential, state objective; for the constitutional order must be preserved by a strong, participatory democratic process." Cal. Democratic Party , 530 U.S. at 587, 120 S.Ct. 2402 (Kennedy, J., concurring). By downgrading all former felons into second-class citizens long after serving out their sentences, where escape is only possible through running through a maze of potential viewpoint discrimination, bias, and arbitrary conduct, Florida's scheme does just the opposite.
III
Turning to Count Two, this Court finds that Florida's vote-restoration scheme permitting unfettered official discretion to restore voting rights also violates the Fourteenth Amendment's Equal Protection Clause.
Plaintiffs largely base their Equal Protection argument on Bush v. Gore , 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The Plaintiffs focus on the admonition that "[t]he right to vote is protected in more than the initial allocation of the franchise.... Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Id. at 104-05, 121 S.Ct. 525.
States can disenfranchise felons. Ramirez , 418 U.S. at 54-55, 94 S.Ct. 2655. Bush v. Gore , then, is not entirely apposite because felons have not been "granted the right to vote." 531 U.S. at 104, 121 S.Ct. 525. Rather, it is the process of granting that right that Plaintiffs challenge. And that process cannot be arbitrary. Shepherd , 575 F.2d at 1114 ("Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."); see also Harvey , 605 F.3d at 1079 (stating that "a state could not choose to re-enfranchise voters of only one particular race" and a state cannot "re-enfranchise only those felons who are more than six-feet tall").
Defendants assert two cases foreclose Plaintiffs' equal protection claim. Beacham v. Braterman , 300 F.Supp. 182, 183 (S.D. Fla. 1969)aff'd 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969), and Shepherd , 575 F.2d 1110. But this Court finds neither case dispositive.
First, in Beacham , the Southern District of Florida rejected a former felon's challenge to Florida's discretionary re-enfranchisement scheme under the equal protection clause. Beacham , 300 F.Supp. at 183 ("[T]he discretionary exercise of the pardon power by the executive branch of Florida's government is being challenged"). A three-judge panel cursorily recited established principles about the broad scope of executive clemency and the separation of powers. Id. at 184. It declined to evaluate the facts or record present in Beacham's challenge to Florida's *1307 discretionary scheme. Id. ("The restoration of civil rights is ... an act of executive clemency not subject to judicial control."). The panel ultimately explained that executive pardon power is "an act of grace" that "should not be subject to judicial intervention." Id.
The Supreme Court summarily affirmed. 396 U.S. 12, 90 S.Ct. 153. A "summary affirmance is an affirmance of the judgment only, [so] the rationale of the affirmance may not be gleaned solely from the opinion below." Mandel v. Bradley , 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). "Summary actions ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." Id. Beacham 's summary affirmance in 1969 did not break any new ground but applied those established principles deferring to executive clemency.
Unlike a fine wine, this summary affirmance has not aged well. More recently, Justice O'Connor, among others, has observed that executive clemency cannot operate outside the bounds of the Constitution. Woodard , 523 U.S. at 289, 118 S.Ct. 1244 ; see also supra at 1303-04. Beacham 's statement that once Florida has "conferred unlimited pardon power upon the executive branch of their government, the exercise of that power should not be subject to judicial intervention" carries no precedential value because it stands for the flawed presumption that an unconstitutional executive clemency structure is immune from judicial review. Beacham , 300 F.Supp. at 184 (emphasis added).
Second, Defendants correctly note that "section 2 of the fourteenth amendment blunts the full force of section 1's equal protection clause with respect to the voting rights of felons." Shepherd , 575 F.2d at 1114. States have "a realm of discretion in the ... reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens." Id. But a re-enfranchisement scheme must "bear a rational relationship to the achieving of a legitimate state interest." Id. at 1115. Defendants rely on Shepherd 's language to assert that Florida has an interest "in limiting the franchise to responsible voters." Id.
These cases do not save Florida's unconstitutional re-enfranchisement scheme. Beacham and Shepherd stand for different propositions. The former cautions courts to steer clear of executive clemency structures because they enable "act[s] of grace" that courts historically have avoided. Beacham , 300 F.Supp. at 184. The latter holds that states only have a "realm of discretion" in vote-restoration schemes. Shepherd , 575 F.2d at 1114 (emphasis added). But no realm is without boundary.
This Court adheres to the boundaries the Founding Fathers placed in the United States Constitution-not to ethereal concepts like "act[s] of grace." Beacham , 300 F.Supp. at 184. One firm boundary is the prohibition on states to deny citizens "equal protection of the laws." U.S. CONST. amend. XIV § 1.
This Court has already explained that executive clemency schemes are not immune from federal court review simply because they are executive clemency schemes.[17] The Eleventh Circuit, as Defendants point out, has relied on Justice O'Connor's reasoning in Woodard to find that "[i]n order for a claim of alleged violations of ... equal protection in a clemency proceeding to succeed, the violation must be grave, such as where 'a state official flipped a coin to determine whether to grant clemency, or in a case where the *1308 State arbitrarily denied a prisoner any access to its clemency process.' " Banks v. Sec'y, Fla. Dep't of Corr. , 592 Fed.Appx. 771, 773 (11th Cir. 2014) (quoting Woodard , 523 U.S. at 289, 118 S.Ct. 1244 (O'Connor, J., concurring) ). The violation in this case-the substantial risk of arbitrary and discriminatory vote-restoration based on an applicant's identity and perceived voting preferences from partisan government officials-is worse than a coin flip.
Moreover, Shepherd binds this Court to excise schemes permitting "a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote." 575 F.2d at 1114 ; see also Hunter , 471 U.S. at 233, 105 S.Ct. 1916 ("[W]e are confident that § 2 [of the Fourteenth Amendment] was not designed to permit the purposeful racial discrimination ... which otherwise violates § 1 of the Fourteenth Amendment."). Even though the Constitution authorizes states to disenfranchise felons, "these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." Rhodes , 393 U.S. at 29, 89 S.Ct. 5.
States can have a legitimate state interest in limiting the franchise to "responsible voters." Shepherd , 575 F.2d at 1115. Florida does this by disenfranchising felons during the entirety of their sentences and then requiring an additional waiting period of five or seven years before these citizens can seek restoration. What is not permissible is a scheme unmoored from any constraints, guidelines, or binding procedures that permit Florida officials to make "completely arbitrary distinction[s] between groups of felons"-or worse. Id. at 1114. Partisan officials' unfettered discretion cannot cull "responsible voters" to include only those voters that might benefit their political party. Such a scheme would, at best, be "arbitrary and disparate." Bush v. Gore , 531 U.S. at 104, 121 S.Ct. 525. At worst, the scheme would be discriminatory.
In short, Florida's scheme violates the Fourteenth Amendment. Plaintiffs' motion for summary judgment as to Count Two is GRANTED . Defendants' motion for summary judgment as to Count Two is DENIED .
IV
In Count Four, Plaintiffs challenge the five and seven-year waiting periods before felons can apply for re-enfranchisement. ECF No. 29, at ¶¶ 113-20. Plaintiffs base their argument on the Anderson - Burdick balancing test that courts apply when examining state election regulations. This Court finds these waiting periods are reasonable restrictions under the Constitution.
When a regulation burdens the right to vote "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " Burdick , 504 U.S. at 434, 112 S.Ct. 2059 (quoting Norman , 502 U.S. at 289, 112 S.Ct. 698 ). On the other hand, if state election regulations "impose[ ] only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Id. (quoting Anderson , 460 U.S. at 788, 103 S.Ct. 1564 ). "Lesser burdens ... trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.' " Timmons v. Twin Cities Area New Party , 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (internal citations omitted).
*1309 Here, the state uniformly applies the waiting periods to all convicted felons. This application poses little risk of viewpoint discrimination-unlike the Board's unfettered discretion discussed in the preceding sections. Plaintiffs set forth no facts showing that these waiting periods infringe on their First and Fourteenth Amendment rights.
But this Court is concerned about the potential for the Board to pick and choose when to apply these waiting periods. Constitutional problems can arise if the Board bypasses these Rules in a way that violates other constitutional provisions-because of race, religion, gender, or viewpoint, for instance.
Plaintiffs identify one former felon who received re-enfranchisement without a hearing even though the Rules appeared to require a hearing. ECF No. 29, at ¶ 67. Though this felon waited more than the requisite time before applying for restoration, this Court would be remiss if it did not emphasize that rules are rules. Especially when the Board writes them.
The five and seven-year waiting periods do not violate the First and Fourteenth Amendments. Accordingly, Plaintiffs' motion for summary judgment on Count Four is DENIED and Defendants' motion as it relates to Count Four is GRANTED .
V
Florida's vote-restoration scheme providing government officials' with unfettered discretion and no meaningful time restraints on the exercise of that discretion violates the First and Fourteenth Amendments. Plaintiffs would also have this Court strike Florida's disenfranchisement statutes as unconstitutional. ECF No. 102, at 43. This Court cannot do so because states have an "affirmative sanction" in the Constitution to disenfranchise felons. Ramirez , 418 U.S. at 54, 94 S.Ct. 2655. It is the Board's process to restore voting rights that this Court finds unconstitutional.
VI
Having determined that Florida's vote-restoration scheme is unconstitutional, this Court must determine the appropriate relief. This Court could simply issue a judgment for declaratory relief. As for injunctive relief, this Court cannot issue an order that is tantamount to saying "act right." See e.g. , Burton v. City of Belle Glade , 178 F.3d 1175, 1201 (11th Cir. 1999) (stating that "[a] court is incapable of enforcing so broad and vague an injunction" when it amounts to instructing a party to obey the law); see also Fed. R. Civ. P. 65(d) (describing how injunctions must state the reasons for its issuance, its specific terms, and a reasonably detailed description of the act(s) restrained or required).
The parties have so far not adequately briefed this Court on remedies. Accordingly, the parties must submit additional briefing as to the contours of injunctive relief, if any, in light of this order by Monday, February, 12, 2018.[18] This Court recognizes that Defendants will likely object to the substance of this order and additional remedies-related briefing will not constitute a waiver of any objections.
This Court does not lightly impose tight timelines on parties. But unique circumstances are at play in this challenge. The vote-restoration process is constitutionally infirm, but in so finding, this Court has effectively prevented otherwise eligible felons *1310 from seeking restoration under Florida's unconstitutional scheme.
Such a course of action runs counter to Florida's Constitution. The state constitution authorizes that the Governor "may ... restore civil rights." FLA CONST. art. IV § 8 (a) (emphasis added). The Florida Constitution does not start with the presumption that the Governor "may not" restore the right, which this order effectively (though temporarily) does. Rather, the Governor's power is permissive. See Fla. Bar v. Trazenfeld , 833 So.2d 734, 738 (Fla. 2002) ("The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.' "). Moreover, Florida's Constitution also expressly bars felons from voting "until restoration of civil rights." FLA. CONST. art. VI § 4 (a) (emphasis added). The Florida Constitution presumes a restoration process exists. And the state has advanced that express presumption by having in place a restoration scheme for decades. This Court will not prevent-even briefly-the express preferences of Florida's Constitution without giving the parties an opportunity to address the appropriate remedy.
VII
This Court is not blind to nationwide trends in which the spigot to access the United States' most "precious" and "fundamental" right, the right to vote, depends on who controls the levers of power. Harper , 383 U.S. at 670, 86 S.Ct. 1079. That spigot is turned on or off depending on whether politicians perceive they will benefit from the expansion or contraction of the electorate. In Florida, more than 154,000 citizens had their voting rights restored during the last gubernatorial administration's four years. Since 2011, a period of seven years, that figure has plummeted-less than 3,000 people have received restoration. The context of these numbers is not lost on this Court. More than one-tenth of Florida's voting population-nearly 1.7 million as of 2016-cannot vote because they have been decimated from the body politic.[19] More than one in five of Florida's African American voting-age population cannot vote.[20]
If any one of these citizens wishes to earn back their fundamental right to vote, they must plod through a gauntlet of constitutionally infirm hurdles. No more. When the risk of state-sanctioned viewpoint discrimination skulks near the franchise, it is the province and duty of this Court to excise such potential bias from infecting the clemency process.
Accordingly,
IT IS ORDERED :
1. Plaintiffs' motion for summary judgment as to *1311 Counts One, Two, and Three is GRANTED . Defendants' motion for summary judgment as to Counts One, Two, and Three is DENIED . Plaintiffs' motion for summary judgment as to Count Four is DENIED . Defendants' motion for summary judgment as to Count Four is GRANTED .
2. Parties shall file briefings related to remedies on or before Monday, February 12, 2018.
3. This Court does not direct entry of final judgment and will not do so until after it has considered the additional briefings as to remedies.
SO ORDERED on February 1, 2018.

The Supreme Court, among other august institutions, has observed the strong correlation between race and voting. E.g. , Cooper v. Harris , --- U.S. ----, 137 S.Ct. 1455, 1473 n.7, 197 L.Ed.2d 837 (2017) (explaining that "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

This Court addresses Plaintiffs' Count Two in Section III, infra at 1306-08.

The Eleventh Circuit has struck down multiple schemes as violations of the First Amendment because they lacked time constraints or contained toothless time limitations. See United States v. Frandsen , 212 F.3d 1231, 1240 (11th Cir. 2000) (holding that a regulation to issue permits "without unreasonable delay" violates the First Amendment "because it fails adequately to confine the time within which the decision maker must act"); Lady J. Lingerie, Inc. v. City of Jacksonville , 176 F.3d 1358, 1363 (11th Cir. 1999) (invaliding an ordinance that conferred zoning board "discretion to delay a decision indefinitely or to covertly deny applications for content-sensitive reasons"); Redner v. Dean , 29 F.3d 1495, 1500-01 (11th Cir. 1994) (finding a 45-day time period for official to grant or deny a license illusory because ordinance's language created "risk that expressive activity will be suppressed for indefinite time periods").

Seesupra at 1303-04.

Plaintiffs shall also submit proposed language for the declaratory judgment in light of this order.

Decimation is a more than apt word. The word refers to the rather outmoded practice of "select[ing] by lot and put[ting] to death one in every ten of (a group of soldiers guilty of mutiny or other crime): a practice in the ancient Roman army, sometimes followed in later times." Decimation , Oxford English Dictionary , Vol. 1, 95 (compact ed. 1971). More than one in ten Florida voters are put to civil death through disenfranchisement-with little hope of resuscitation under the unfettered discretion vote-restoration scheme. See The Sentencing Project, 6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016 , at 15 (October 2016), available at https://www.sentencingproject.org/wp-content/uploads/2016/10/6-Million-Lost-Voters.pdf.

Data gathered from The Sentencing Project, 6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016 , at 15-16 (October 2016), available at https://www.sentencingproject.org/wp-content/uploads/2016/10/6-Million-Lost-Voters.pdf.